**619 A.2d 222**

GLENN COOKE, PLAINTIFF-APPELLANT,
v. WILENTZ, GOLDMAN & SPITZER,
DEFENDANT-RESPONDENT.

Superior Court of New Jersey
Appellate Division

Argued April 14, 1992—Decided December 21, 1992.

Before Judges MICHELS, HAVEY and CONLEY.

*John R. Ford,* attorney, argued the cause for appellant (*Mr. Ford* on the brief).

*Christopher J. Carey* argued the cause for respondent (*Tompkins, McGuire & Wachenfeld,* attorneys; *Mr. Carey,* of counsel; *Mr. Carey* and *Joseph T. Calabria,* on the brief).

The opinion of the court was delivered by

CONLEY, J.A.D.

Plaintiff appeals a final judgment dismissing his complaint against defendant for legal malpractice. He had sued defendant for its failure to timely file a toxic tort personal injury lawsuit against the manufacturer of certain products he was exposed to at his workplace. Following the completion of plaintiff's case at a *Lopez*[1] hearing, the trial judge concluded the statute of limitations had expired prior to plaintiff's retention of defendant and granted defendant's motion for "a directed verdict." We reverse.

Plaintiff Glenn Cooke worked for Jersey Central Power & Light Company for thirty-five years before his retirement in 1986. During his tenure he worked primarily in auto body repair and painting. In the early or mid–1970's plaintiff started having reactions after exposure to certain of the painting products he worked with. The reactions consisted of shortness of breath that would last two to four hours, and occurred when plaintiff mixed Imron paints two or three times per week.

---

[1] *Lopez v. Swyer,* 62 *N.J.* 267, 300 *A.*2d 563 (1973).

During his workers' compensation trial in October 1981, plaintiff acknowledged he had first started to notice the reactions "I would say several years ago, maybe four, five years ago when we were exposed to the new product from Dupont called Imron, and, in fact, I don't—I stopped using Imron for some time because it affected me so badly." But as he explained during the *Lopez* hearing when asked if he was aware at that time of a relationship between his episodic reactions to the chemical and a particular medical condition:

No, I wasn't, because I worked with so many products that might cause temporary—whatever you would call it—you'd step outside and get some fresh air or it would pass. But, you see, in 1980, '81, I felt I had a persistent problem that wasn't going away. . . .

And so, in 1980, after seeing his family doctor several times because the problem had become more persistent, plaintiff concluded "this is more than just an occasional thing." As he testified, he suspected the problem "might be work related." His request to see a company doctor was denied, according to plaintiff because he did not work with "hazardous materials."

Plaintiff then sought legal advice and retained the firm of Wilentz, Goldman & Spitzer (defendant) in February 1981. A worker's compensation action was filed in May 1981, which described plaintiff's injury as "chronic obstructive pulmonary disease" resulting from exposure to "lacquers, paint thinners, toluene, various plastic resin compounds and enamel reducers." [2]

In connection with this claim, plaintiff saw several doctors. Dr. Rowland Goodman examined plaintiff on May 6, 1981 and recorded the following:

It is my opinion that there is a causal relationship between the plaintiff's present pulmonary condition and the exposure [to the chemicals listed on the claims petition].

--------

[2] A worker's compensation judgment was entered October 1981 awarding plaintiff 10% partial total disability for "pulmonary-chronic obstructive pulmonary disease." An amended judgment was entered January 1985 increasing the award to 25% partial permanent disability.

In July 1981 plaintiff was treated by Dr. Daniel Markowitz who made a diagnosis of probable mild industrial asthma. In his report, the doctor observed there was "very little question from this man's history that he is becoming sensitized to one of the chemicals that he works with." When plaintiff was subsequently examined by Dr. Paul Friedman, an associate of Dr. Markowitz, in March 1983, Dr. Friedman wrote to his employer:

> Recently Mr. Glen Cooke has returned to see us in our office. He is a 51 year old man who states that he has noticed for the last five or six years shortness of breath, wheezing and chest tightness after exposure to the various fumes that are encountered during his job. Although he does not know all the chemicals involved he has identified Toluene, Diisocyanate as one of the chemicals. Diisocyanate is now well known to be toxic to human lung. *Mr. Cooke first came to see us in July 1981 complaining of the above symptoms and at that time our [sic] physical exam he appeared completely normal.* Pulmonary function tests were done which measured his lung function and these too proved to be normal. Mr. Cooke states that *since then he has tried to avoid these fumes while at work but reports that he still came in contact with them. He states that his respiratory symptoms have become gradually but progressively worse and in addition notes that he finds that his lungs are now sensitive to many other substances which never seemed to bother him before.* For example he finds that fumes from automobiles or buses and various pollens now cause him to get shortness of breath and wheezing. Mr. Cooke returned to my office in *February 1983* and on physical exam then wheezing in the lungs were noted. *A pulmonary function test was then obtained which showed a mild but significant decrease in pulmonary function especially when compared to his 1981 study.* He is presently taking medication which indeed has given him some relief.
>
> I have strongly recommended to him to completely avoid these industrial fumes otherwise his symptoms will become progressively worse.
>
> [Emphasis added].

In June 1984 plaintiff was seen by Dr. David Egilman whose report states plaintiff had suffered shortness of breath and chest pains as early as the early 1970's upon mixing Imron paints. The episodes would last two to four hours. The symptoms became more severe when plaintiff was transferred to a new paint shop in 1980. A particularly acute attack in December 1982 caused plaintiff to cease working. The report also indicates plaintiff continued jogging sixty miles weekly until 1982 when his condition forced him to stop. At the time of his appointment with Dr. Egilman in 1984, plaintiff had

"developed adult onset asthma in addition to his acute symptoms of asthma on exposure."

In addition to the workers' compensation petition, in February 1983 plaintiff told defendant that he had been advised by Dr. Egilman litigation should be brought against the manufacturer of the chemical. According to plaintiff, the initial response to him from the attorney then handling the case was "I don't think we can pursue that." Plaintiff, however, claims he continued to inquire about the filing of such litigation and, finally, following a November 1984 meeting a complaint was filed in the federal district court on December 10, 1984 against E.I. DuPont alleging permanent pulmonary injuries from exposure to DuPont's paint additives. However, on May 22, 1987 the complaint was dismissed based upon *N.J.S.A.* 2A:14–2. In doing so, District Court Judge Barry found plaintiff knew or should have known of the injury and its cause prior to December 10, 1982, two years prior to the filing of the action; the dismissal of the complaint was affirmed without opinion by the Third Circuit on March 4, 1988. Thereafter in January 1989 plaintiff sued defendant.

In granting defendant's motion at the end of plaintiff's case at the *Lopez* hearing, the trial judge initially and incorrectly viewed the issue as "whether Mr. Cooke should have discovered or perceived that he had a basis for an actionable claim more than two years prior to the filing of the complaint in December 1984." In answer thereto, she found factually that his cause of action occurred "no later than October 1981." In this respect she said:

A cause of action doesn't accrue under *Lopez* until an injured party perceives that he has a basis for a claim or should so perceive with the exercise of reasonable diligence and intelligence.

That is not a subjective standard. It is an objective standard. Whether Mr. Cooke should have discovered or perceived that he had a basis for an actionable claim more than two years preceding the filing of the complaint in December of 1984 is the issue.

I think the answer is yes and that Mr. Carey's motion is granted. And the view is based on my finding that Mr. Cooke's problems were repeated whenever he used certain products, so that he even went to the length, as he has described,

of discontinuing the use of certain products. Imron is one that has been mentioned. And he referred to that fact in the October '81 Worker's Compensation hearing that he had actually been aware of a connection between his condition and his work exposure during 1980 when he sought medical exams by company representatives, which has been part of his testimony and it has been referred to elsewhere.

If the medical opinions on which the Worker's Comp claims were made showed that in 1981 there was a casual relationship between his exposure to the chemicals and his pulmonary condition, that may not have been specifically conveyed to him. But he stated at the Worker's Comp hearing that he thought there might be a connection.

His statements to Dr. Egilman have been repeated here and showed that he knew when he mixed and sprayed certain chemicals he had periods of shortness of breath, and this certainly relates to a period substantially prior to the cutoff date that would have applied in this case.

So I come back to a test, the objective test imposed, which is whether reasonable diligence and intelligence have been applied to the facts and had they been applied whether there would have been recognition of the cause of action sought to be asserted with respect to the product, and I conclude that clearly the application of reasonable diligence and intelligence would have required that Mr. Cooke be aware that he had such a claim at a date prior to the cutoff date here in question with the date of the filing of the complaint and that suit clearly then was appropriately time barred.

And with respect to this case, I believe I have shown the dates as clearly being no later than October 1981 and that motion [defendant] must be granted.

The trial judge erred in analyzing the issue, for the question is not whether the cause of action was discovered more than two years prior to the DuPont litigation in 1984. It is whether it had occurred more than two years before defendant was retained in February 1981, for the basis of defendant's motion was that it could not have timely filed a personal injury lawsuit at the time plaintiff hired it because the statute of limitations had already run. As properly framed, the October 1981 date would have supported plaintiff's claim. When this was brought to the trial judge's attention, she then said:

Giving him the benefit of doubt, four years, he said he went to the company doctor because he perceived—not because he perceived, but because he was having repeated episodes. He had four to five years prior to that time noted the connection between his pulmonary problems, his breathing problems and the use of certain chemicals, so that he learned that when he discontinued the use of certain chemicals, went out, took a breath, whatever, it assuaged the problem. Once he knew that, he knew there was a connection.

Thus the trial judge finally concluded the necessary knowledge was or could have been acquired during the 1970's, not October 1981, and therefore granted defendant's motion. We are convinced she erred in doing so.

■ Preliminarily, we note that procedurally defendant's motion was for an involuntary dismissal after plaintiff had completed the presentation of his evidence during the *Lopez* hearing. As such, the trial judge, as must we, was required to determine whether there was any evidence, including any favorable inferences therefrom, which could sustain a judgment in plaintiff's favor. *R.* 4:37–2(b). The evaluation is a "mechanical one. The trial court is not concerned with the worth, nature or extent (beyond a scintilla) of the evidence, but only with its existence, viewed most favorably to the party opposing the motion." *Dolson v. Anastasia,* 55 *N.J.* 2, 5–6, 258 *A.*2d 706 (1969). So viewed, we think the evidence plainly established plaintiff did not and reasonably could not have discovered a cause of action against the manufacturer until 1980–1981.

■ Suits for personal injury must be commenced within two years from accrual of the cause of action. *N.J.S.A.* 2A:14–2. The test is not always a mechanical one but incorporates what is commonly referred to as the "discovery rule." Pursuant to this rule, accrual of a cause of action does not arise until a litigant "learns, or reasonably should learn, the existence of that state of facts which may equate in law with a cause of action." *Burd v. New Jersey Tel. Co.,* 76 *N.J.* 284, 291, 386 *A.*2d 1310 (1978); *Lopez v. Swyer,* 62 *N.J.* at 272, 386 *A.*2d 1310. *See also Lynch v. Rubacky,* 85 *N.J.* 65, 73, 424 *A.*2d 1169 (1981). The discovery rule, however, is not applicable in every case; rather it is:

... called into play "when a party is either unaware that he has sustained an injury or, although aware that he has sustained an injury or, although aware that an injury has occurred, he does not know that it is, or may be attributable to the fault of another." *Tevis v. Tevis,* 79 *N.J.* 422, 432 [400 *A.*2d 1189] (1979). One's awareness of an injury or deleterious condition does not always equate with the accrual of a cause of action. At times, as in this case, "the inquiry

must focus upon fault as well as injury where the awareness of the fault is not self-evident in the injury...."

[*Vispisiano v. Ashland Chemical Co.*, 107 *N.J.* 416, 427, 527 *A.*2d 66 (1987)].

As articulated in *Vispisiano*, "the critical question ... is when [plaintiff] discovered or should have discovered, by exercise of reasonable diligence and intelligence, that the physical condition of which he complains was causally related to his exposure to chemicals [at his workplace]." 107 *N.J.* at 427, 527 *A.*2d 66. *Vispisiano* dealt specifically with the application of the statute of limitations to toxic torts. In doing so, the Supreme Court observed that the nature of the particular injury and the difficulty inherent in discovering certain types of injuries are critical factors to consider and which may, in those cases, "radically alter the balance of interests." 107 *N.J.* at 428, 527 *A.*2d 66. For, as observed by the Court, "[t]oxic tort victims do not become aware of their injuries until decades after the tortious act." 107 *N.J.* at 428–29, 527 *A.*2d 66, *quoting* Note, *The Fairness and Constitutionality of Statutes of Limitations for Toxic Tort Suits*, 96 *Harv.L.Rev.*, 1683, 1685 (1983).

Our recent decision in *Wanner v. Philip Carey Mfg. Co.*, 243 *N.J.Super.* 516, 580 *A.*2d 734 (App.Div.1989), illustrates this concept. There, an insulation worker was periodically examined to monitor the effects of his exposure to asbestos. It was the examining doctor's practice to correspond with plaintiff to communicate his findings after examinations. In 1984 after one such examination, the doctor found an x-ray had shown "some scarring of the sort we commonly find following asbestos insulation work" and pulmonary function tests had "shown some decrement." Plaintiff, however, had been told at the examination he was in good health. He had no symptoms at the time. Several years later, in 1987, some symptoms developed; plaintiff was then diagnosed as having "pleural fibrosis and calcification" and he filed suit shortly thereafter. Defendant sought to have the suit dismissed as time-barred because the 1984 examination and x-ray finding put plaintiff on notice of his occupational illness. We, however, found the suit timely.

We noted the doctor's overall reassuring advise in 1984 from which "[w]e would not expect plaintiff to discern ... any intimation that he was suffering from a disease caused by exposure to asbestos." *Id.* at 519, 580 *A.*2d 734. Overall, "the import of the letter is that although some scarring is present, abnormality is absent and there is no cause for concern." *Id.* at 520, 580 *A.*2d 734. We observed:

"... there is rarely a magic moment when one exposed to asbestos can be said to have contracted asbestosis; the exposure is more in the nature of a continuing tort." The effects of exposure to asbestos are not always accompanied by a redressible form of disability. They become more insidious with continued exposure, and with passage of time they ripen into a disease.

[*Id.* at 520, 580 *A.*2d 734, *quoting Karjala v. Johns–Mansville Products Corp.*, 523 *F.*2d 155, 160–61 (8th Cir.1975)].

Thus, we found "a working man presumably without medical training, was not reasonably expected to know from the information before him that his asbestos-related condition had matured into an injury for which he could seek redress." *Id.* at 521, 580 *A.*2d 734.

■ The same principles apply here. The evidence viewed most favorably to plaintiff reveals, most assuredly, he had some indication in the 1970's and prior to 1981 there might be a problem, but the problem had not "ripened into a disease," the condition had not "matured into an injury for which he could seek redress." Undisputed is his testimony he perceived no "abnormality" in his occasional episodic reactions upon direct exposure to the chemicals. The record contains numerous indications plaintiff suffered a progressive condition. But it does not support a finding, at least at the procedural posture of defendant's motion, that it had "matured into an injury for which he could seek redress" until 1981. Dr. Markowitz, for instance, said in July 1981:

I think there is very little question from this man's history that he is *becoming* sensitized to one of the chemicals that he works with. *Although from his physical exam he appears quite normal now I suspect that his symptoms will only get progressively worse the more he is exposed to these chemicals since now he obviously has become sensitized to at least some of the*

*components.* I have advised Mr. Cooke that if at all possible he should avoid contact with these chemicals. [Emphasis added].

Dr. Markowitz diagnosed the problem in 1981 as "probable mild industrial asthma."

Although plaintiff admitted at the time his 1981 worker's compensation hearing that he had had difficulty occasionally with a cough and episodic reactions to chemicals at least four or five years earlier, they had always cleared up. It was not until 1980 when plaintiff was transferred to a new paint shop that his symptoms became more severe. And thus, when examined by Dr. Markowitz in July 1981, he was asymptomatic but *becoming* sensitized. It was in 1980–1981 after plaintiff contacted an attorney and was examined by various doctors who perceived a problem greater than temporary episodic reactions to the chemicals he was exposed to, that plaintiff could reasonably be said to know or should have known he had an actionable injury caused by his exposure to the chemicals.

We reject defendant's somewhat disingenuous contention Judge Barry's dismissal of the federal action is dispositive. Judge Barry's decision addressed a limited and different issue: whether the statute of limitations had expired prior to plaintiff's filing the personal injury suit on December 10, 1984. In that respect, she found "plaintiff knew or reasonably can be expected to have known of the relationship between these DuPont products and his injury prior to December 10, 1982 and that his claim is therefore time barred." Her decision went no further. Defendant's statement that "... Judge Barry's decision ... was that plaintiff knew or reasonably should have known prior to 1978 of his potential cause of action" is simply not correct.

Defendant's motion for involuntary dismissal, thus, should have been denied and defendant permitted to present whatever proofs it had as part of its case at the *Lopez* hearing. We reverse and remand for further proceedings consistent with this opinion.