**Jerry DIAZ and Cathy Diaz, Plaintiffs,**

v.

**JOHNSON MATTHEY, INC. and Johnson Matthey, PLC, Defendants.**

Civ. No. 92–4717(JEI).

United States District Court,
D. New Jersey.

Nov. 18, 1994.

Alvin M. Gross, Alvin M. Gross & Associates, Cherry Hill, NJ, for plaintiffs.

David J. Novack, Daniel Feuerstein, Budd Larner Gross Rosenbaum Greenberg & Sade, P.C., Short Hills, NJ, for defendants.

## OPINION GRANTING JMI'S MOTION FOR SUMMARY JUDGMENT AND GRANTING IN PART AND DENYING IN PART JM PLC'S MOTION FOR SUMMARY JUDGMENT

IRENAS, District Judge.

Plaintiff, Jerry Diaz, worked in New Jersey for defendant, Johnson Matthey, Inc. ("JMI"), from 1981 to 1990. Defendant, Johnson Matthey, PLC ("JM PLC"), is JMI's parent corporation. Plaintiff seeks damages for the long term health effects of on-the-job exposure to platinum salts.[1] Diaz claims that employees of both JMI and JM PLC advised him that the condition was temporary and that he would have no further health problems related to the allergy when he stopped working for JMI and was no longer exposed to platinum salts. On November 9, 1992, plaintiffs filed suit in Camden County Superior Court for fraud and conspiracy to defraud against both defendants, intentional infliction of harm by JMI, and negligence by JM PLC. That same day defendants removed the case to federal court pursuant to 28 U.S.C. § 1441(a).[2]

Presently before the Court are defendants' motions for summary judgment pursuant to Fed.R.Civ.P. 56. JMI's motion is granted because plaintiff's exclusive remedy against his employer is under the provisions of the New Jersey Workers' Compensation Act, N.J.S.A. 34:15–8 (Supp.1994). Summary judgment on plaintiffs' fraud, conspiracy, and punitive damages claims is denied because plaintiffs have adduced sufficient evidence which, if believed by the trier of fact, would sustain a cause of action based on fraud or negligence. Issues relating to the need for or the admissibility of expert testimony, or to the qualifications of any proposed expert witness, are reserved for the time of trial or an appropriate motion *in limine*. Summary judgment on the conspiracy claim against JM PLC is granted since plaintiffs fail to produce evidence of any agreement between JMI and JM PLC to defraud JMI employees.

## I. FACTUAL BACKGROUND

From 1981 through 1990 plaintiff worked in New Jersey for JMI, first at its plant in Winslow and after 1984 in its West Deptford facility. JMI is in the business, *inter alia*, of refining, recovering and marketing precious metals, including platinum. JMI's parent, JM PLC, is an English corporation with headquarters in London.

Refining and recovery of platinum creates chloroplatinate salts which are allergic sensi-

---

1. Jerry Diaz's wife is also seeking *per quod* damages for loss of consortium. To the extent we hold that his claim is precluded by the tort bar of the Workers' Compensation Act, N.J.S.A. 34:15–8, Cathy Diaz's claim will also be barred. *Danek v. Hommer*, 9 N.J. 56, 87 A.2d 5 (1952).

2. Defendants also argue that plaintiffs failed to file their claims within the statutory time limit of two years from accrual of the cause of action. N.J.S.A. 2A:14–2. "[A]ccrual of a cause of action does not arise until a litigant 'learns or reasonably should learn, the existence of the state of facts which may equate in law with a cause of action.'" *Cooke v. Wilentz, Goldman & Spitzer*,

261 N.J.Super. 391, 397, 619 A.2d 222, 226 (App. Div.1992) (*citing Burd v. New Jersey Tel. Co.*, 76 N.J. 284, 291, 386 A.2d 1310, 1314 (1978)). There is a clear factual dispute as to when Diaz knew or reasonably should have known the facts on which his cause of action is based, and summary judgment is therefore inappropriate. *See Cipollone v. Liggett Group, Inc.*, 893 F.2d 541, 581 (3d Cir.1990), *aff'd in part, rev'd in part on other grounds*, —— U.S. ——, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992) (reversed summary judgment because jury could conclude complaints were time barred).

tizers. If a worker exposed to platinum salts becomes sensitized, he may suffer symptoms such as conjunctivitis (watery eyes), rhinitis (runny nose), uticarria (skin welts), and dyspnea (shortness of breath). The percentage of workers exposed to platinum salts who will become allergic is in dispute. In a 1989 plant-wide survey, twenty-six of 233 JMI employees skin prick tested were sensitized to platinum salts, although only three or four of the twenty-six employees had physical symptoms of the allergy. Plaintiffs, on the other hand, point to a 1951 study[3] involving twenty-one platinum workers which suggests that 60–100% of those exposed to platinum salts will eventually become allergic.

At the core of this litigation is the question of whether those who develop an allergic reaction to platinum salt exposure will continue to suffer adverse health consequences if they are no longer exposed to the irritant. Diaz alleges that long before he was hired, the chief medical officer of JM PLC and a JMI advisor, Dr. E. Glynn Hughes, was aware of the continuing impact of the platinum allergy:

Q: Do you recall when you became aware that prolonged exposure to platinum salts, after sensitization, could lead to long-term health effects?

A: I suspected that this may be the case in the early 1970's, certainly prior to 1972.

(Hughes Dep. at 14; Plaintiffs' Br. at Ex. 4). By October of 1979 Dr. Hughes was aware that at least one former employee of a JM PLC platinum refinery still had platinum allergy symptoms after leaving employment. (Plaintiffs' Br. at Ex. 7.)

In 1981, the National Institute of Occupational Safety and Health ("NIOSH") began conducting a platinum allergy study which tested present and former workers at JMI, including Diaz. An interim report distributed, but not published, in May of 1982 stated that there *may* be long term effects from the platinum allergy. (Plaintiffs' Br. at Ex. 9).

In early 1984, Dr. Hughes attended a lecture given by Dr. Stuart M. Brooks, one of the NIOSH doctors involved in the 1981 study. Dr. Brooks revealed ongoing lung problems among platinum refinery workers for as long as three years after exposure. (Plaintiffs' Br. at Ex. 15).

In June of 1990 NIOSH finally published the results of the study started in 1981:

[I]t has generally been concluded that asthma in terminated platinum refinery workers does not persist once work exposure has ceased. Our findings are contrary to this conclusion.... These findings *suggest* that allergic sensitization with asthma symptoms and the presence of nonspecific airway hyperresponsiveness in affected workers *may* continue for years after leaving the industry.

Brooks et al., *Cold Air Challenge and Platinum Skin Activity in Platinum Refinery Workers*, Chance, June 1990, at 1405 (Plaintiffs' Br. at Ex. 18) (emphasis added). This conclusion was consistent with a 1985 study by the National Centre for Occupational Health in South Africa which found that "[c]ertain South African workers were continuing to have asthmatic symptoms up to thirteen months after ceasing exposure." (Plaintiffs' Br. at Ex. 10.)[4]

Despite the NIOSH and South African studies, the question of how long the allergic symptoms endure after cessation from exposure remains unresolved. In 1982–1983, Dr. A. J. Newman Taylor was commissioned by JM PLC to conduct a study similar to the one started by NIOSH. Although it is alleged that Dr. Newman Taylor's initial work suggested the possibility of chronic effects from exposure to platinum salts, his final study found no evidence of long term respiratory problems.[5] Even the medical advisor to Diaz's former union has testified that "the issue of whether platinum exposure has long term health effects has still not been re-

---

3. *See infra* note 4.

4. Plaintiffs also contend that a 1951 study by Dr. A. Eaton Roberts supports plaintiffs' assertion that platinum allergy causes long term health problems. "Platinosis", 4 *A.M.A. Archives of Industrial Hygiene and Occupational Medicine* 549

(1951) (Plaintiffs' Br. at Ex. 3). The Court has read this article and finds that, if anything, this article supports the opposite conclusion.

5. This study was never published in a recognized medical or occupational health journal.

solved." (Joint Final Pre–Trial Order at ¶ 87.)

For the time period relevant to this case (1981–1990), JMI attempted to avoid hiring individuals with a tendency to develop allergies, and prior to 1988 JMI had a policy of discharging any individual who became allergic to platinum salts. Diaz alleges that JMI did not follow this termination policy because he and many other JMI employees known by JMI to have the platinum allergy were not discharged.

In April of 1981, Diaz applied for employment in the maintenance department of JMI. Prior to receiving his job offer from JMI, Diaz had an interview with the plant nurse and underwent a physical examination. During the interview, the nurse discussed the potential health hazards of platinum salt exposure. She also informed Diaz about the symptoms associated with the platinum allergy and the medical termination policy at JMI. The nurse told Diaz to report any symptoms of the allergy to her. Diaz's pre-employment medical exam included a pulmonary function test and a skin prick test to determine if he was atopic (sensitive to common household allergens). Records of the skin prick test cannot be located (Diaz believes the result was non-atopic). Although JMI claims that Diaz's pulmonary function tests were marginal, Diaz was certified fit for employment and started work at JMI on May 18, 1991.

Shortly after he began work at JMI, Diaz participated in the NIOSH platinum allergy study being conducted at JMI. After his physical examination, NIOSH informed Diaz that he was sensitive to various common household allergens and that he possibly suffered from rhinitis and asthma due to his exposure to platinum salts, although it was "likely that Mr. Diaz did not have platinum allergy." (Joint Final Pre–Trial Order at ¶ 38.) While Diaz never disclosed this information to JMI, he did discuss the test results with members of the United Steelworkers Union ("the Union") which represented JMI's employees and which had been concerned since 1980 about the platinum allergy problem at JMI.

In late 1981–early 1982, Diaz viewed a videotaped lecture presented by Dr. Hughes discussing the platinum allergy in detail. This lecture stated that the platinum allergy "does not cause chronic lung disease." (Plaintiffs' Br. at Ex. 1.) In 1983, Diaz claims that he received a JMI document distributed to JMI employees stating that removal from exposure to platinum compounds would eliminate the effects of the platinum allergy. (Plaintiffs' Br. at Ex. 19.)

By September 1983, Diaz knew that he had the platinum allergy. JMI claims that Diaz never reported his allergy symptoms to the company, but plaintiff counters that he reported his symptoms to the plant nurse on several occasions. Until 1988 the Union opposed periodic skin prick tests on current employees to determine sensitivity to platinum salts, probably because a positive finding might result in employee termination. JMI did, however, conduct periodic physical examinations of their employees, including a pulmonary function test. Decrease in lung functions from prior tests can be an indication of the platinum allergy.

JMI alleges that, prior to taking certain lung function tests, Diaz used Primatine Mist to deceive JMI regarding his symptoms. As a result, Diaz's tests would often be normal. Diaz argues that JMI knew that he used the medication, and there is a notation on a JMI document regarding his use of Primatine Mist.

Diaz was an active union member who was its Vice President in 1988 and became President the following year. As part of his review of Union documents, Diaz saw the NIOSH interim report and other JM PLC documents regarding the platinum allergy in 1988 or 1989, and possibly earlier.[6] In his capacity as Vice President of the Union, Diaz claims that in 1988 he met with Dr. Hughes' successor as chief medical officer of JM PLC, Dr. Morag Stewart. Dr. Stewart allegedly told Diaz that after removal from exposure to platinum salts, Diaz could expect a full recovery. Sometime after May 1989, Dr. Stewart again allegedly told Diaz that the effects of

6. JMI claims Diaz might have read these reports   earlier.

the platinum allergy were only temporary. *Id.*

Diaz was actively involved in the collective bargaining sessions between the Union and JMI held in the fall of 1988. Periodic skin prick testing was one of the topics discussed during these negotiations. Dr. David Parkinson, an occupational physician, provided advice to the Union during negotiations. Diaz alleges that Dr. Hughes withheld from Dr. Parkinson material information regarding the long term health problems of the platinum allergy. On Dr. Parkinson's recommendation the skin prick testing program was accepted by the Union.

In April of 1989, all JMI employees were skin prick tested for the platinum allergy. Diaz tested positive. JMI referred Diaz to a private physician specializing in allergies, Dr. Robert Perin. Dr. Perin saw Diaz once a month for six months, at which point he concluded that any remaining symptoms were due to other allergies. Diaz left Dr. Perin's care with the caution to avoid further exposure to platinum salts.

During the last twelve months of his employment JMI sought to identify non-exposure areas of the plant where Diaz could work without risk of further allergic reactions. Notwithstanding the change in work assignment, plaintiff's symptoms persisted, and in August of 1990 Dr. Perin recommended that Diaz terminate his employment with JMI, which he did on October 29, 1990.

In September 1990, Joe Molle, the human resources manager at JMI informed Diaz's subsequent employer that the medical condition which forced him to leave JMI was unique to the platinum refinery business and should in no way limit Diaz in other employment.

## II. STANDARD FOR SUMMARY JUDGMENT

Under Fed.R.Civ.P. Rule 56(c), "summary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). At the summary judgment stage, it is not the role of the judge to weigh the evidence or to evaluate its credibility, but simply to determine "whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). In making its decision, the Court must view the evidence in the light most favorable to the non-moving party. *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962). There is no issue for trial unless there is sufficient evidence favoring the non-moving party such that a reasonable jury could return a verdict for that party. *Anderson,* 477 U.S. at 249, 106 S.Ct. at 2510.

The Supreme Court has stated that "a party opposing a properly supported motion for summary judgment may not rest upon the mere allegations or denials of his pleading, but ... must set forth specific facts showing that there is a genuine issue for trial." *Anderson,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986) (citations omitted) (internal quotations omitted). The substantive law governing the dispute will determine which facts are material, and only disputes over those facts "that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510.

## III. EXCLUSIVE REMEDY OF WORKERS' COMPENSATION

The defendants argue that summary judgment must be ordered because of the exclusive remedy provision of the New Jersey Workers' Compensation Act.[7] N.J.S.A. 34:15–8. We consider this issue as it applies to both the claims against JMI and JM PLC.

### A. Claims Against JMI

■ Both plaintiffs and defendant JMI rely on *Millison v. E.I. du Pont de Nemours*

---

7. Diaz did file a workers' compensation action in April of 1990; an order of judgment for $9,786 was entered for Diaz on April 14, 1992.

& Co., in which the New Jersey Supreme Court considered whether the exclusive remedy provision of the Compensation Act precluded a separate tort action against their employer and the employer's physicians by employees who have suffered occupational diseases. 101 N.J. 161, 501 A.2d 505 (1985). The exclusive remedy provision states:

> If an injury or death is compensable under this article, a person shall not be liable to anyone at common law or otherwise on account of such injury or death for any act or omission occurring while such person was in the same employ as the person injured or killed, *except for intentional wrong.*

N.J.S.A. 34:15-8 (emphasis added).

After a lengthy discussion of the legislative history and subsequent development of the Compensation Act, *Millison* determined that in order to constitute an "intentional wrong," the level of risk exposure must be substantially certain. "[T]he mere knowledge and appreciation of a risk—even the strong probability of a risk—will come up short of the 'substantial certainty' needed to find an intentional wrong[.]" 101 N.J. at 179, 501 A.2d at 514.

In *Millison*, the plaintiffs alleged that not only had the workers been deliberately subjected to the known risk of harm of asbestos exposure but also that the company's medical department had concealed from its employees diseases which had already been diagnosed. *Pratta v. E.I. du Pont de Nemours & Co.*, No. 92–1987, 1992 U.S.Dist. LEXIS 12105, at *3–4 (D.N.J. Aug. 7, 1992). *Millison* held that the employees were limited to workers' compensation benefits for injuries from occupational diseases contracted through their employment but allowed plaintiffs to proceed on their claim for aggravation of illnesses caused by defendants' alleged concealment of disabilities discovered during employee physical examinations. 101 N.J. at 166, 501 A.2d at 516.

It was possible for the plaintiffs in *Millison* to prove substantial certainty of harm

because the doctors had already diagnosed the diseases contracted by the employees and caused by workplace asbestos exposure. Nondisclosure of these employees' diagnoses delayed their treatment and aggravated their existing illnesses. Plaintiff in this case has demonstrated neither medically nor statistically a substantial certainty that Diaz or any other JMI employee would suffer harm after exposure to platinum salts was ended.

There is no substantial medical certainty because the current state of scientific knowledge does not permit a definitive conclusion. While the NIOSH findings "suggest" that workers "may" continue to have asthma symptoms and nonspecific airway hyperresponsiveness after leaving the platinum industry, the Union's own medical advisor believes that "the issue of whether platinum exposure has long term health effects has still not been resolved." (Joint Final Pre–Trial Order at ¶ 87.)

Substantial statistical certainty of harm to platinum workers is lacking on two levels. First only a certain number of workers contract the platinum allergy at all. In 1989 only twenty-six of 233 employees tested positive to a skin prick test, and of this group only three or four were suffering from actual physical symptoms.[8] Even if we accept the conclusions of the NIOSH report, there is every indication in the record that only some unknown percentage of those who suffer when exposed to platinum salts would continue to suffer when the exposure ceases:

> Characteristic of the histories in these cases were the first two reported. One person had worked in the refinery 18 years and had symptoms after the first year. These symptoms became slowly but progressively worse until finally he was forced to give up this work. *The symptoms disappeared immediately on his leaving and did not recur.* The second person presented symptoms after six years of service, becoming gradually worse until asthma appeared in the 10th year. *This employee*

---

8. It may be that chance of becoming sensitized increases with the period of exposure, but no work force is composed only of long time employees. This may explain the apparent discrepancy between the 1989 JMI figures and the much higher percentages suggested in the 1951 study referred in the article in note 4, *supra.*

*was transferred to another department and has not since suffered from asthma.*

\*   \*   \*   \*   \*   \*

*Sequelae*—Platinosis does not appear to alter the general health of the individual in any way, or is there any evidence that it may predispose to tuberculosis or to pulmonary cancer.

Roberts, *supra* note 4, at 550–552 (emphasis added).

The plaintiffs in *Millison* claimed that their exam results were concealed in order to induce them to continue to work under hazardous conditions. 101 N.J. at 189, 501 A.2d at 520 (Handler, J., concurring in part and dissenting). JMI, on the other hand, had a policy of discharging sensitized employees or trying to move them to locations where there was reduced exposure. While Diaz disputes the degree to which JMI followed this policy, he does not dispute that this policy existed. Not only were pulmonary function tests utilized to identify those who may have become sensitized, but JMI also attempted, over Union objection until 1988, to conduct periodic skin prick testing[9] to determine the sensitivity of employees to platinum salts.

While there may be a medical dispute as to the permanency of the condition developed by workers who become sensitized, no one has suggested that workers who do not suffer allergic reactions when exposed to platinum salts are negatively impacted after the exposure has ceased. Thus, by attempting to identify those who have become sensitized and removing them from the source of irritation, JMI was also offering at least some protection against any possible long term harm. Even if we assume, *arguendo*, that JMI misrepresented its knowledge of the long term health impact of platinum salt exposure, JMI's overall conduct stands in sharp contrast to the policy of concealment practiced by the *Millison* defendants.

*Millison* determined that concealing from an employee that he already suffered from a serious medical condition caused by a workplace condition could not be "viewed as a fact of life of industrial employment", but was rather "plainly beyond anything the legislature could have contemplated as entitling the employee to recover *only* under the Compensation Act[.]" *Id.* (emphasis in original); *see also Bustamante v. Tuliano,* 248 N.J.Super. 492, 591 A.2d 694 (App.Div.1991), *certif. denied,* 126 N.J. 385, 599 A.2d 162 (1991) (examining context of injury to find no intentional wrong). In this case the undisputed facts show both an employer and union with extensive knowledge of the problem, each making some effort to deal with it. Even if it becomes established that some employees may suffer irreversible sequelae from the platinum allergy, this kind of occupational disease was certainly not beyond the contemplation of the legislators drafting the Compensation Act.[10]

While plaintiffs acknowledge that the "substantial certainty" standard would guide the Court's determination of the summary judgment motion as to the fraudulent conspiracy claims, Diaz argues that his claim for intentional infliction of harm has not been addressed by *Millison, Pratta,* or any New Jersey court. There is nothing in *Millison* to suggest that its holding is premised on the nomenclature applied to the tortious conduct. *Millison's* touchstone is the substantial certainty of harm, a certainty not present in this case. Defendant JMI's motion for summary judgment on the fraud, conspiracy to defraud, and intentional harm claims against JMI is therefore granted.

**B. Claims Against JM PLC**

█ JM PLC argues that the plaintiffs' claims against JM PLC are barred by the exclusive remedy doctrine of the Workers' Compensation Act. The New Jersey Supreme Court has restricted the immunity

---

9. Skin prick testing is a more accurate means of testing for the platinum allergy than pulmonary function testing.

10. In fact, the Compensation Act defines occupational disease as

all diseases arising out of and in the course of employment, which are due in a material degree to causes and conditions which are or were characteristic of or peculiar to a particular trade, occupation, process or place of employment.

N.J.S.A. 34:15–31.

accorded by the Compensation Act to the entity that is the immediate employer of the injured worker. *Lyon v. Barrett,* 89 N.J. 294, 302, 445 A.2d 1153, 1157 (1982) *(citing Mingin v. Continental Can Co.,* 171 N.J.Super. 148, 408 A.2d 146 (Law.Div.1979)). The *Lyon* court stated:

> The fixed dollar ceiling on benefits under the workers' compensation laws are the result of a trade-off of certain liability of the employer for reduced awards for the employee. Injured workers are entitled not only to recover against employers under workers' compensation laws, but also against third parties under tort law.

89 N.J. at 305; 445 A.2d at 1158 *(citing* 2A Larson, *Workmen's Compensation Law* § 72.50, at 14–95 (1976)).

*Vernon v. Supermarket Services Corp.,* a 1991 Appellate Division case, is directly on point. 250 N.J.Super. 8, 593 A.2d 345. An employee of Supermarket Distribution Services ("SDS") was injured during the course of his employment allegedly due to the negligence of Supermarket Services Corporation ("SSC"). Both SSC and SDS are wholly owned subsidiaries of the Great Atlantic & Pacific Tea Company ("A & P"). Plaintiff was awarded workers' compensation benefits from A & P which provided workers' compensation self-insurance to SDS and SSC. Plaintiff filed a negligence action against SSC. 250 N.J.Super. at 9, 593 A.2d at 346. *Vernon* held that even though A & P provided the insurance for all of its subsidiaries— including SSC and SDS—A & P could not transfer the immunity of one of those subsidiaries (the injured employee's employer) to either itself or another subsidiary. 250 N.J.Super. at 10, 593 A.2d at 346. Likewise, JM PLC cannot transfer the immunity of JMI to itself. Therefore we will deny JM PLC's motion for summary judgment.

### III. *FRAUD BY JM PLC*

■ Diaz alleges that JM PLC fraudulently misrepresented to JMI employees that the platinum allergy does not cause chronic lung disease and concealed its suspicions, based on empirical observation and scientific studies, that this categorical assertion was untrue.[11]

■ Both plaintiffs and defendant JM PLC agree that the New Jersey law of fraud applies to this case. Legal fraud is defined as " 'a material misrepresentation of a presently existing or past fact, made with knowledge of its falsity and with the intention that the other party rely thereon, resulting in reliance by that party to his detriment.' " *Nappe v. Anschelewitz, Barr, Ansell & Bonello,* 97 N.J. 37, 51, 477 A.2d 1224, 1232 (1984) *(quoting Jewish Center v. Whale,* 86 N.J. 619, 624, 432 A.2d 521, 524 (1981)). Furthermore, at trial, plaintiffs would bear the burden of establishing the elements of fraud by clear and convincing evidence. *Stochastic Decision v. DiDomenico,* 236 N.J.Super. 388, 395, 565 A.2d 1133, 1137 (App.Div. 1989), *certif. denied,* 121 N.J. 607, 583 A.2d 309 (1990); *Schmidt v. Schmidt,* 220 N.J.Super. 46, 51, 531 A.2d 385, 387 (Ch.Div.1987).

■ As stated *supra,* there is no issue for trial unless there is sufficient evidence favoring the non-moving party such that a reasonable jury could return a verdict for that party. *Anderson,* 477 U.S. at 249, 106 S.Ct. at 2510. " [A] trial judge must bear in mind the actual quantum and quality of proof necessary to support liability[.]' " *Jenkins v. KYW, A Division of Group W, Westinghouse Broadcasting & Cable, Inc.,* 829 F.2d 403, 405 (3d Cir.1987) *(quoting Anderson,* 477 U.S. at 254, 106 S.Ct. at 2513). Therefore, to avoid summary judgment, plaintiffs must present evidence by which a jury could find fraud by clear and convincing evidence. *Constitution Bank v. DiMarco,* 836 F.Supp. 304, 307 (E.D.Pa.1993), *aff'd without op.,* 27 F.3d 556 (1994); *Oxford Industries, Inc. v. Luminco, Inc.,* No. 86–6417, 1991 WL 87928, at *5, 1991 U.S. Dist. LEXIS 7099, at *14

---

11. Plaintiffs also argue that JM PLC (1) discouraged and undermined studies of the platinum allergy, (2) attempted to suppress studies which found chronic respiratory problems caused by the platinum allergy and (3) created its own studies to advance its own medical theories on the platinum allergy. This conduct would not amount to legal fraud absent some form of misrepresentation or intent to mislead. Whether proof of these allegations would be evidential on the issue of fraud will be determined at the time of trial.

(E.D.Pa. May 22, 1991), *aff'd without op.*, 947 F.2d 936 (3d Cir.1991).

■ "For a litigant to succeed on a claim of legal fraud ... he must first establish the falsity of a material representation of a presently existing or past fact." *Joseph J. Murphy Realty, Inc. v. Shervan*, 159 N.J.Super. 546, 551, 388 A.2d 990, 993 (App.Div.1978), *certif. denied*, 79 N.J. 487, 401 A.2d 242 (1979). When a statement is susceptible of exact knowledge, it is considered fact rather than opinion. *Id.* (*citing* 37 Am.Jur.2d, *Fraud and Deceit* § 46, at 74).

JM PLC argues that there was no material misrepresentation of a presently existing or past fact because even today the long term impact of platinosis is subject to scientific dispute. JM PLC cites cases involving statements that courts have characterized as "puffery" or "vague and ill-defined opinions" rather than assurances of fact. *E.g., Joseph J. Murphy Realty, Inc.*, 159 N.J.Super. 546, 388 A.2d 990 (assurance of the sale of a home by broker held to be opinion); *Rodio v. Smith*, 123 N.J. 345, 587 A.2d 621 (1991) (Phrase, "You're in good hands with Allstate" was puffery, not fact).

■ An honestly expressed opinion is not fraudulent because later scientific knowledge proves the opinion to have been erroneous. Plaintiff argues, however, that what was deliberately misrepresented was not the truth or falsity of a particular scientific proposition (the permanence of allergic reactions to platinum salt exposure), but the state of mind of the JM PLC officials who made the representations. It is not necessary to prove that the platinum allergy is a chronic disease to show that certain JM PLC officials knowingly misrepresented what *they* knew or suspected about the platinum allergy's long term effects.

State of mind is of particular significance if the employer's representative is a medical professional. A doctor's personal doubts, suspicions or intuition on a medical issue are "facts" of importance when an employee must make decisions involving his health.

Indeed, these "facts" take on increased significance when they relate to an area where there is medical uncertainty.

In a videotape shown twice to Diaz sometime between 1981 and 1983, JM PLC's chief medical officer, Dr. Hughes, states: "[t]his allergy to platinum that we are concerned with in fact does not cause chronic lung disease." (Plaintiffs' Br. at Ex. 1.) As discussed *supra*, there is evidence that Dr. Hughes suspected, on the contrary, that prolonged exposure to platinum salts, after sensitization, could lead to long term health effects. Dr. Stewart, who succeeded Dr. Hughes, harbored similar suspicions. In a memo dated October 15, 1990, she makes it clear that she had seen the 1982 interim NIOSH report concluding that there may be long term effects from the platinum allergy. (Plaintiffs' Br. at Ex. 18.)

At least for purposes of summary judgment, there is evidence sufficient to establish a cause of action for fraud. A doctor's suspicions that the workplace could lead to irreversible physical harm might well be considered material information to an employee, and a jury could infer from Diaz's allegations that Dr. Stewart and Dr. Hughes intended that Diaz rely on their statements in order to allay Diaz's fears regarding the platinum allergy. Because Diaz continued his employment with JMI, a jury could also find that Diaz relied on the statements of JM PLC's doctors. JM PLC can argue that Diaz would have remained on the job despite full information on the platinum allergy because of evidence which suggests that Diaz hid his condition despite warnings. These are precisely the issues of fact which should be decided by the trier of fact and not by a judge on summary judgment.

Plaintiffs should not underestimate the formidable hurdle that will be presented at the trial of this case. First, there are inherent difficulties in proving by clear and convincing evidence that there were, in fact, material misrepresentations, particularly in light of the changing state of scientific knowledge on the subject during the 1980's.[12] Then they

12. One is reminded of a question often asked in connection with a noted political scandal: "What did he know, and when did he know it?"

must establish not only that Diaz would have quit JMI upon learning of Hughes' suspicions but also that Diaz's current condition is in fact causally related to his employment at JMI.

■ Expert testimony will be required on a variety of issues including the core issue in this case: are the sequelae of the platinum allergy permanent? Tying Diaz's current condition to his employment at JMI will also require expert testimony, particularly since asthma and breathing difficulties are relatively common afflictions with multiple causes, and there is some indication in the record that plaintiff is a cigarette smoker with prior lung capacity impairment. *See In re Paoli R.R. Yard PCB Litigation,* 35 F.3d 717, 783 (3d Cir.1994) ("There are far fewer alternative causes of asbestosis than there are alternative causes for the injuries being attributed to furans"). Nothing in this opinion should be construed to hold, one way or the other, that the expert testimony which plaintiffs intend to proffer at trial will meet the necessary legal requirements. *See* Fed. R.Evid. 403, 702 and 703; *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* —— U.S. ——, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993); *In re Paoli R.R. Yard PCB Litigation, supra;* and *Rubanick v. Witco Chemical Corp.,* 125 N.J. 421, 449, 593 A.2d 733 (1991).[13]

## IV. *NEGLIGENCE CLAIM AGAINST JM PLC*

■ The first issue we must resolve is what law to apply. There are three different localities connected to this case: England, New Jersey, and Pennsylvania. Pennsylvania is relevant only because it is where JMI was incorporated and has its principal place of business; England because it is where JM PLC is incorporated; and New Jersey because Diaz was employed there during the periods relevant to this case. Since we have previously granted JMI's motion for summary judgment, we only address the choice between the laws of England and New Jersey.

■ A federal court sitting in New Jersey must employ New Jersey's choice of law rules in deciding what law should apply to the case. *See Klaxon v. Stentor,* 313 U.S. 487, 496–97, 61 S.Ct. 1020, 1021–22, 85 L.Ed. 1477 (1941). New Jersey has a statute that provides for the judicial notice of foreign law. N.J.S.A. 2A:82–27 *et seq.* Section 27 of the Act provides that "in the absence of such pleading or notice [of the common or statute law of a foreign jurisdiction], it shall be presumed that the common law of such State is the same as the common law as interpreted by the court of this State." *See also* E. Scoles & P. Hay, *Conflict of Laws* § 12.19 (1984).

■ As a general rule, "where no information, or else insufficient information, has been obtained about the foreign law, the forum will usually decide the case in accordance with its own local law except when to do so would not meet the needs of the case or would not be in the interests of justice." *Restatement (Second) of Conflict of Laws* § 136, at cmt. h (1993). As neither party has expressed an interest in applying the law of England, and as we do not discern that the interests of justice require us to do so, we will apply the law of New Jersey, the place where many, if not most, of the events related to this case took place.

■ Diaz relies on *Heinrich v. Goodyear Tire and Rubber Co.,* 532 F.Supp. 1348 (D.Md.1982), in which an employee's complaint against the employer's parent corporation based on an alleged failure to provide proper health safety information concerning chemicals used at the plant was held sufficient to defeat a motion for dismissal under Fed.R.Civ.P. 12(b)(6). In holding for the plaintiff the court relied on § 324A of the Restatement (Second) of Torts (commonly called the Good Samaritan law) which reads as follows:

> One who undertakes, gratuitously or for consideration, to render services to anoth-

---

**13.** JM PLC has challenged the adequacy and admissibility of the proposed testimony of plaintiffs' only expert witness, Dr. Donald Auerbach. The court believes that decisions as to the admissibility of expert testimony should generally be made either on motions *in limine* or following objections at trial—and then only when there is an opportunity to make a complete record at a Fed.R.Evid. 104(a) hearing. *See In re Paoli R.R. Yard PCB Litigation* at 739.

er which he should recognize as necessary for the protection of a third person or his things, is subject to liability for physical harm resulting from his failure to exercise reasonable care to [perform] [14] his undertaking, if

(a) his failure to exercise reasonable care increases the risk of such harm, or

(b) he has undertaken to perform a duty owed by the other to the third person, or

(c) the harm is suffered because of reliance of the other or the third person upon the undertaking.

*Restatement (Second) of Torts* § 324A (1965).

Several New Jersey appellate courts have adopted § 324A. *E.g., Jackson v. New Jersey Mfrs. Ins. Co.,* 166 N.J.Super. 448, 400 A.2d 81 (App.Div.), *certif. denied,* 81 N.J. 330, 407 A.2d 1204 (1979). "Although not dispositive, decisions of state intermediate appellate courts should be accorded significant weight in the absence of an indication that the highest state court would rule otherwise." *City of Philadelphia v. Lead Industries Ass'n,* 994 F.2d 112, 123 (3d Cir.1993).

In *Van Winkle v. American Steam Co.,* the court held

that in all cases in which any person undertakes the performance of an act which, if not done with care and skill, will be highly dangerous to the persons or lives of one or more persons, known or unknown, the law, *ipso facto,* imposes as a public duty the obligation to exercise such care and skill.

52 N.J.L. 240, 247, 19 A. 472, 474 (Sup.Ct. 1890). *Van Winkle* was cited approvingly by the New Jersey Appellate Division in *Viducich v. Greater N.Y. Mutual Ins. Co.,* 80 N.J.Super. 15, 23, 192 A.2d 596, 600 (App. Div.1963) where the court applied § 325 of the Restatement (First) of Torts, the equivalent of § 324A of the Restatement (Second) of Torts. *See also, Jackson,* 166 N.J.Super. at 457–58, 400 A.2d at 85.

The New Jersey Supreme Court has held that a third party injured as a result of the negligent performance of an act by an independent contractor has a cause of action in tort even though that third party could not base his action in contract since he was not a party to the contract. *Bacak v. Hogya,* 4 N.J. 417, 73 A.2d 167 (1950). *Van Winkle, Bacak,* and other appellate cases [15] lead us to believe that the New Jersey Supreme Court would analyze Diaz's claims in light of § 324A. Other district courts have also concluded that New Jersey would adopt § 324A. *Billetz v. Johns–Mansville Corp.,* No. 80–2976 (D.N.J. Apr. 17, 1984); *Sun Pipe Line Co. v. Conti Construction Co., Inc.,* No. 86–2011, 1989 WL 58679, 1989 U.S.Dist. LEXIS 6213 (D.N.J. June 1, 1989).

Diaz argues that JM PLC undertook to provide health and safety information regarding the platinum allergy to JMI and that Diaz was injured as a result of the negligent provision of this information. An affidavit from the chief medical officer of JM PLC, Dr. Hughes, avers that he and his successor Dr. Stewart were advisors to JMI on occupational health issues. (Aff. of E. Glynn Hughes, M.D., filed Sept. 9, 1994.) Although Dr. Hughes and Dr. Stewart had no authority to instruct that specific actions be taken at JMI, they did make general recommendations regarding occupational health issues. *Id.*

In advising JMI, JM PLC owed a duty to provide accurate guidance not only for the benefit of JMI, but also for the benefit of those who may suffer harm "because of reliance ... upon the undertaking." We will not repeat our previous recitation of the evidence except to observe that for purposes of sum-

---

**14.** The published text of § 324A uses the word "protect" rather than "perform". This was a typographical error. *Hill v. United States Fidelity & Guaranty Co.,* 428 F.2d 112, 115 n. 5 (5th Cir.1970), *cert. denied,* 400 U.S. 1008, 91 S.Ct. 564, 27 L.Ed.2d 621 (1971).

**15.** In addition to *Viducich* and *Jackson, supra,* other New Jersey appellate cases cite § 324A: *Abel Holding Co., Inc. v. American District Tele-* graph Co., 147 N.J.Super. 263, 371 A.2d 111 (App.Div.1977); *Essex v. New Jersey Bell Telephone Co.,* 166 N.J.Super. 124, 399 A.2d 300 (App.Div.1979); *Brooks v. New Jersey Mfrs. Ins. Co.,* 170 N.J.Super. 20, 405 A.2d 466 (App.Div.), *certif. denied,* 81 N.J. 413, 408 A.2d 806 (1979); *Juliano v. Gaston,* 187 N.J.Super. 491, 455 A.2d 523 (App.Div.1982), *certif. denied,* 93 N.J. 318, 460 A.2d 709 (1983).

mary judgment there is more than enough evidence upon which a jury might base a finding of negligence as defined by § 324A. We likewise incorporate our previous observations about the difficult burden facing plaintiffs at the trial and the need for proper expert testimony.

## V. *CONSPIRACY CLAIM AGAINST JM PLC*

 Both parties rely on the laws of New Jersey in arguing the viability of the conspiracy cause of action. While the gravamen of a civil conspiracy action is the underlying wrong and the resulting damage, *Middlesex Concrete Products and Excavating Corp. v. Carteret Industrial Ass'n,* 37 N.J. 507, 516, 181 A.2d 774, 779 (1962), the existence of the conspiracy depends on agreement among the alleged conspirators. While circumstantial evidence may be sufficient to prove an agreement, pure speculation is not. *Board of Education v. Hoek,* 38 N.J. 213, 239, 183 A.2d 633, 646–47 (1962).

▪ Plaintiffs have provided no evidence whatsoever of an agreement between JM PLC and JMI to defraud JMI employees. Diaz alleges that JM PLC officials misrepresented information regarding the platinum allergy to JMI management who passed along this alleged misinformation to JMI employees. This allegation is not evidence of an agreement between JMI and JM PLC. Therefore, JM PLC's motion for summary judgment on the conspiracy claim is granted.

## VI. *PUNITIVE DAMAGES CLAIM AGAINST JM PLC*

▪ To warrant a punitive damages award in New Jersey, JM PLC's conduct must have been wantonly reckless or malicious. *Nappe,* 97 N.J. at 49, 477 A.2d at 1230.

> Something more than the commission of a tort is always required for punitive damages. There must be circumstances of aggravation or outrage, such as spite or "malice," or a fraudulent or evil motive.

97 N.J. at 50, 477 A.2d at 1231 (internal quotations and citations omitted). *Nappe* found it especially fitting to allow punitive

damages for legal fraud, "since intent rather than mere negligence is the requisite state of mind." *Id.* Since we have already found sufficient evidence for Diaz's fraud claim to survive, the motion to strike the punitive damages claim will therefore be denied. Defendant may renew this application at the close of plaintiffs' case when the Court will better be able to evaluate whether the evidence of "wantonly reckless or malicious" conduct justifies submitting the issue to the trier of fact.

The Court will enter an order in conformance with this opinion.