Albert A. ALEXANDER, Alexander Agency, Inc., William J. Hourigan, Jr., Broome–Hourigan, Inc., Gene F. Stern, Lester G. Block, Thomas J. Fria, Kurmin Insurance Agency Inc., Jay S. Horn, Horn Insurance Services, Ltd., John Cecchettini, d/b/a/ John Cecchettini Insurance Agency, JJSG, Inc., t/a Holly Park Insurance Agency, Jonathan Klein, Professional Insurance Mangers, Inc., Robert J. McVeigh d/b/a/ McVeigh Insurance Agency, Robert J. McVeigh, John Cecchettini, David J. Carlough, Jr., David J. Carlough, Sr., and WMR. Troop Agency, Inc., Plaintiffs,

v.

CIGNA CORPORATION, CIGNA Fire Underwriters Insurance Company, CIGNA Property & Casualty Insurance Company, CIGNA Insurance Company, Bankers Standard Insurance Company, Bankers Standard Fire & Marine Insurance Company, Century Indemnity Company, Insurance Company of North America, Pacific Employers Insurance Company, Aetna Fire Underwriters Insurance Company and Aetna Insurance Company, Defendants.

No. Civ. 95–1661(JAG).

United States District Court,
D. New Jersey.

Jan. 5, 1998.

---

Jack Atkin, Hector Torres, Kasowitz, Hoff, Benson, Torres & Friedman, New York City, for plaintiffs.

Law Offices of Dana G. Kirk, Houston, TX, for plaintiffs.

Thomas A. Martin, John L. Amabile, Michael P. Collins, Putney, Twombly, Hall & Hirson, Iselin, NJ, Baker & Botts, L.L.P., Austin, TX, for defendants.

## OPINION

GREENAWAY, District Judge.

This matter comes before the Court on the motion for summary judgment of Putney, Twombly, Hall & Hirson and Baker & Botts, L.L.P, co-counsel for defendants, CIGNA Corporation ("CIGNA Corp."), CIGNA Fire Underwriters Insurance Company, CIGNA Property & Casualty Insurance Company, CIGNA Insurance Company, Bankers Standard Insurance Company, Bankers Standard Fire & Marine Insurance Company, Century Indemnity Company, Insurance Company of North America, Pacific Employers Insurance

Company, Aetna Fire Underwriters Insurance Company and Aetna Insurance Company (collectively referred to as "CIGNA P & C").

## FACTS

Plaintiffs are nine independent insurance agencies, located in New Jersey, and their principals (collectively referred to as "COMPAR Agents").[1] Defendant CIGNA Corp. is a Delaware corporation. The remaining defendants (collectively "CIGNA P & C") were, at all relevant times, subsidiaries of CIGNA Corp. and were engaged in the business of writing property and casualty insurance policies through independent insurance agencies.

In 1972, Insurance Company of North America (now a part of the CIGNA Property and Casualty Companies), started a program known as "COMPAR." Under COMPAR, an insurance agent agreed to write virtually all of his property and casualty business through CIGNA P & C; in exchange, CIGNA P & C paid the agent higher commissions and enhanced profit-sharing bonuses, among other benefits. Martin Cert.Ex. 64 at 33–36 & Ex. 65 at 17.[2] According to the defendants, the idea behind COMPAR was that it would be beneficial for both agents— i.e., the agents would increase their commission and bonus income and lower their overhead expenses by having to deal with only one company, id., and the company would benefit by attracting a lower risk class of insurance business because only those insurance agencies who were successful at identifying profitable business would be invited to join the COMPAR program. *Id.* at Ex. 46 at 35–36. However, according to the plaintiffs, the fact that the COMPAR agents exclusively represented CIGNA, "made the COMPAR Agents totally dependent on CIGNA because it required them to sever and prevented them from developing relationships with, and selling products for, CIGNA's competitors and hinged the COMPAR Agents' success solely on CIGNA's performance." Plaintiff 12G at 3, ¶ 4.[3]

By 1990, COMPAR was a nationwide program. Hourigan joined COMPAR in 1972, Alexander in 1973, Troop in 1975, McVeigh in 1979, Professional Insurance in 1984, Horn in 1984, Block in 1988, Cecchettini in 1988 and Kurmin in 1988. Every few years, these COMPAR Agents signed new, virtually identical documents; they signed their last such document in late 1989, effective January 1990.[4] Plaintiff 12G at 2, ¶ 2.

Because the program required an agency to give up its contracts with other standard carriers, the relevant COMPAR contracts that CIGNA P & C offered its agents contained a minimum period of five years before they could be canceled (an initial three year term, after which a two-year notice of termination could be given to either side) unless the contract was mutually amended or consensually terminated during its term. Each Full Service Agency Agreement also contained a merger or integration clause which explicitly nullified all prior oral and written agreements between the agency and CIGNA P & C. Supp.App.Ex. 2. The applicable merger clause in the 1990 Agreement, reads as follows:

1. The COMPAR Agents' claims were originally asserted in separate actions but have been consolidated into this action. The COMPAR agents are Albert A. Alexander and the Al Alexander Agency, Inc. ("Alexander"), Robert J. McVeigh and the McVeigh Insurance Agency ("McVeigh"), Gene F. Stern and the Lester Block, Inc. Agency ("Block"), Thomas Fria and the Kurmin Insurance Agency, Inc. "(Kurmin"), John Cecchettini and the John Cecchettini and JJSG Insurance Agencies ("Cecchettini"), Jonathan Klein and the Professional Insurance Managers, Inc. Agency ("Professional Insurance"), David Carlough, Jr. and David Carlough, Sr. and the William R. Troop Agency ("Troop"), William Hourigan, Jr. and the Broome–Hourigan, Inc. Agency ("Hourigan") and Jay Horn Insurance Services, Ltd. Agency ("Horn").

2. References in the form "Martin Cert." are to the Certification of Thomas A. Martin, Esq. and the attached exhibits thereto, submitted by defendants in support of this motion.

3. References in the form "Plaintiff 12G at _" are to plaintiffs' statement of undisputed material facts, submitted pursuant to then General Rule 12G, now amended to Local Civil Rule 56.1.

4. A copy of a standard COMPAR Full Service Agency Agreement is annexed as Exhibit 2 to the Supplemental Appendix of Exhibits (hereinafter, "Supp.App."), submitted by defendants in support of this motion.

11. This Agreement is a Full Service Agency Agreement between you and us. Any previous agency agreement, whether between you and us, whether oral or written, is now void. The Agreement may be amended only in writing and the amendment must be signed by you and us.[5]

The contract—including the 1990 Agreement—executed by each of the plaintiff agencies states: "You are an independent contractor. You are free to exercise your own judgment in conducting your business. Nothing in this Agreement shall be interpreted as creating an employee/employer relationship between us." Supp.App.Ex. 2 ¶ 1(b). Plaintiffs' testimony confirms that COMPAR agents operated fully independent businesses and made their own business decisions. Martin Cert. Exs. 16–19.

In approximately February 1990, CIGNA P & C informed the COMPAR Agents that they were terminating the COMPAR program, effective January 1992. Plaintiffs claim this termination was abrupt and unilateral and that it left them unable to re-establish ties with other carriers in order to service their existing business, much less seek to obtain new business. As a result, the COMPAR Agents claim they were severely damaged, up to and including the complete destruction of the businesses of four of the plaintiffs.[6]

Defendants claim that the termination of the COMPAR program emanated from a change in the "organizational structure" of CIGNA P & C. According to Caleb Fowler, then President of CIGNA P & C, a task force was formed in mid–1989. The task force's work led him to conclude that CIGNA P & C's focus for the 1990's should be on "segmentation," whereby CIGNA P & C would concentrate on certain "core segments" in which insurance for particular types of business would be written. Martin Cert.Ex. 45 at 94–99, 102–05, 110, 116–18. As a result, Fowler decided that CIGNA P & C could not meet the broad underwriting needs of the COMPAR agents and that the COMPAR program should therefore be changed to a non-exclusive relationship. *Id.* at Ex. 47. According to the defendants, management learned of this decision on the same day as CIGNA P & C sent written notice to each plaintiff that the COMPAR program was to be phased out. *Id.* at Ex. 48. Indeed, Fowler testified that he had no intention to end COMPAR in the 1980's and never considered it until early 1990. *Id.* at Ex. 45 at 74–76, 99–100.

Moreover, simultaneous with informing the agents in or about February 1990 that the COMPAR program would be terminated, CIGNA P & C offered the agents an amendment to the 1990 Agreement—the so-called "transition agreement."[7] The transition agreement continued the commission and profit sharing from the 1990 Agreement but allowed the agents to "sell insurance policies issued by insurers other than us and you may become licensed to represent such insurers." Martin Cert.Ex. 14. All nine agencies took advantage of and signed the transition agreement, which became effective January 1, 1992. The 1992 Agreement contained a merger clause with language virtually identical to that in the 1990 Agreement. *Id.* at Ex. 15 ¶ 10. Thus, each plaintiff expressly agreed that the 1990 Agreement was "now void."

However, plaintiffs claim they were forced into signing the transition agreement; specifically, they claim they were told that if they did not sign the new agreement that CIGNA P & C would enforce "exclusivity"—i.e., the

---

**5.** The 1990 Agreement, signed by each plaintiff, also provided (as did those which preceded it) that the COMPAR contract could be terminated for, among other reasons, breach of any provision in the Agreement (¶ 6(b)), by mutual agreement (¶ 6(c)) or upon either party giving two years' notice (¶ 6(d)(1)). Paragraph 7(b) spelled out the post termination rights and obligations of the parties. *See* Supp.App.Ex. 2.

**6.** As stated above, plaintiffs argue that the exclusivity component of the COMPAR program made the COMPAR Agents totally dependent on CIGNA because it required them to sever, and prevented them from developing relationships with, and selling products for, CIGNA's competitors. Thus, when the COMPAR Program was abruptly terminated, the COMPAR Agents were in a particularly vulnerable position.

**7.** An example of the transition agreement is annexed as Ex. 14 to the Martin Cert.

COMPAR Agents would not be allowed to seek out other carriers—and simultaneously cut their commissions and other benefits and would not underwrite their business. Atkin Cert.Ex. 28 at 423–24, Ex. 30 at 247–48, Ex. 31 at 292–99, Ex. 32 at 339–344, Ex. 33 at 235–37, Ex. 34 at 191, Ex. 35 at 610–11, Ex. 43 at 138–39.[8] As a result, plaintiffs claim they were financially harmed by, among other things, the fact that CIGNA: (a) immediately began refusing to underwrite the COMPAR Agents' new business; (b) immediately began refusing to provide competitive pricing for the COMPAR Agents' existing business; (c) forced the COMPAR Agents to spend most of their time seeking alternative carriers—which they could not find—for their existing business, precluding them from seeking new business; and (d) reduced the COMPAR Agents' commission rates after the so-called transition period.

In April 1995, more than five years after executing the transition agreement, plaintiffs filed a Complaint in this Court.[9] On August 30, 1996, plaintiffs filed an Amended Complaint, alleging breach of fiduciary duty, negligent misrepresentation, fraudulent inducement, fraudulent concealment, breach of contract, promissory estoppel, equitable estoppel and reformation.[10] Specifically, plaintiffs claim that:

CIGNA betrayed the trust and confidence plaintiffs placed in CIGNA by, among other things: (i) concealing the serious concerns CIGNA had about the program's profitability in late 1986 through 1988; (ii) concealing the fact that CIGNA was considering "abandoning" the COMPAR program as early as 1987; (iii) concealing CIGNA's lack of commitment to the COMPAR program as early as 1987; (iv) concealing CIGNA's plans to reduce COMPAR benefits in 1987 and 1988; (v) concealing the fact that COMPAR was on shaky ground in late 1987; (vi) concealing that CIGNA considered "blow[ing] up the program" in early 1989; (vii) concealing CIGNA's strategic intent regarding the COMPAR program in late 1989—early 1990; (viii) representing to COMPAR agents that they were the key to CIGNA's success in the 1990's, all the while making plans to dismantle the program; and (ix) attempting to "milk [the COMPAR] cow" in 1989 and 1990.

Amended Complaint ¶ 24, Martin Cert.Ex. 1; *see also, e.g.,* Atkin Cert.Exs. 47, 49, & 54. Plaintiffs claim that they relied, to their detriment, on the following oral and written misrepresentations made by the defendants, during telephone conferences and personal meetings held in plaintiffs' offices in New Jersey and CIGNA's offices in Pennsylvania, as well as COMPAR meetings held at various cities around the country:

8. References in the form "Atkin Cert." are to the Certification of Jack Atkin, and the attached exhibits thereto, submitted by plaintiffs in opposition to this motion.

9. The nine plaintiffs in this case originally filed suit, along with five other New York-based former COMPAR agents, in the Southern District of New York. After the defendants filed a motion to dismiss, plaintiffs voluntarily withdrew their complaint. Subsequently, the New York agents refiled in New York and the New Jersey agents filed nine separate complaints in this Court. Plaintiffs in both forums were represented by the same counsel and the original complaints were, in all material respects, identical. Defendants moved to dismiss in both forums. In May 1996, the district court in the Southern District of New York granted defendants' motion. *See* Martin Cert.Ex. 60. The New York plaintiffs did not seek leave to replead or move for reconsideration but instead filed a direct appeal with the Second Circuit. While that appeal was pending, the parties resolved the New York litigation.

10. Although plaintiffs do not specifically allege a cause of action for mental distress, they mention mental distress in the "WHEREFORE" clause of their Amended Complaint; specifically, in their request for damages. Amended Complaint ¶ 60(a), Martin Cert.Ex. 1. Plaintiffs also do not allege a specific cause of action for duress or economic coercion but instead make the following allegations in the fact section of the Amended Complaint: "CIGNA attempted to hide its intent to terminate the COMPAR program by referring to its action as a 'transition' ... To effectuate this scheme, defendants attempted to coerce plaintiffs to sign a letter agreement which purported to amend the COMPAR agreement ..." *Id.* at ¶ 28. Since these claims are not pled with the requisite specificity and particularity as is required under the Federal Rules of Civil Procedure, this Court need not decide whether these matters formally rise to the level of causes of action that must be addressed. Also, plaintiffs make no mention of these matters in their papers.

(a) the COMPAR program had the total support of everyone at CIGNA, from top management down to field personnel;

(b) the COMPAR program would provide plaintiffs with an increased commission level, including an attractive and higher than normal profit sharing plan;

(c) the relationship between CIGNA and plaintiffs would be long-lasting;

(d) the COMPAR agreement would be one "in perpetuity";

(e) CIGNA was committed to the COMPAR program, which was a major part of CIGNA's future plans;

(f) CIGNA had a long-term commitment to the COMPAR program;

(g) CIGNA would not be a "class underwriter" when dealing with plaintiffs as COMPAR agents;

(h) CIGNA was committed to a full personal lines market;

(i) COMPAR would continue to be a vital element in CIGNA's success plan for the 1990's and beyond; and

(j) the COMPAR program was the marketing program that was key to CIGNA's success and would take CIGNA into the twenty-first century and beyond.

Amended Complaint ¶ 25, Martin Cert.Ex. 1; *see also, e.g.,* Atkin Cert.Ex. 6 at Q.22, Ex. 27 at 407–08, Ex. 28 at 184–85, Ex. 30 at 124–25, Ex. 31 at 119, Ex. 32 at 93, 105–06, 306, Ex. 33 at 135–36, Ex. 34 at 65–66, Ex. 35 at 537, 551, 563–64, 566–67, Ex. 36 at 376–77, Ex. 43 at 65, 350, 352, 353–54, Ex. 77 at 35, 38.[11] Plaintiffs also claim they were sent a "CIGNA COMPAR videotape showing the placing of a wedding band on a finger to depict the nature of the relationship between CIGNA and its COMPAR agents." Amended Complaint ¶ 20, Martin Cert.Ex. 1.

Specifically, plaintiffs claim that in reliance upon these misrepresentations:

> set forth in paragraph 25 [of the Complaint], plaintiffs renewed their "Full Service Agency Agreement (COMPAR)," continued to terminate their relationship with all of the other insurance companies and roll all of their insurance business from those companies over to CIGNA, remained in the COMPAR Program with CIGNA and forewent other business opportunities.

*Id.* at ¶ 26. Plaintiffs add that the so-called transition agreement was of no assistance because

> [h]aving entered into this exclusive relationship with CIGNA, plaintiffs effectively burned their bridges with other insurance carriers. As a result, when CIGNA breached the COMPAR agreement and canceled the COMPAR program, withdrew from lines of insurance in the state of New Jersey and refused to renew or rewrite policies for plaintiffs' customers, it was virtually impossible for plaintiffs to find insurance products for their customers and, as a result, plaintiffs lost many customers and sustained severe harm to their agencies.

*Id.* at ¶ 29. In the end, plaintiffs allege that four of the COMPAR Agents (Kurmin, Block, Horn and McVeigh) were forced out of business and compelled to sell their agencies at distress prices. The others also suffered out-of-pocket losses, as well as the loss of the benefit of the bargain into which CIGNA had induced them to enter. Atkin Cert., Exs. 12–20.[12]

---

**11.** Other evidence of CIGNA's alleged misrepresentations is set forth by the plaintiffs in the Atkin Cert.Ex. 24.

**12.** According to plaintiffs' expert, E. Al Diamond, the COMPAR Agents' total damages, based on their expected lifetime earnings in COMPAR, are as follows: (i) McVeigh, $4,077,209; (ii) Horn, $10,810,389; (iii) Cecchettini, $10,926,572; (iv) Troop, $10,055,519; (v) Alexander, $17,268,149; (vi) Hourigan, $16,393,886; (vii) Kurmin, $17,623,593; (viii) Block, $4,502,264; and (ix) Klein, $14,339,143. Atkin Cert. Exs.12–20. During oral argument in this case, plaintiffs singled out Hourigan, claiming that as a result of specific assurances given to him by CIGNA, his agency, Broome–Hourigan, purchased the Roth Agency with a $600,000 loan from CIGNA. *See id.* at Ex. 19; *see also* Pla. Brief at 10 n. 17. However, other than this reference to Exhibit 19, plaintiffs do not provide the Court with any additional evidence on Hourigan. Thus, the Court does not view the Broome–Hourigan/Roth Agency transaction as anything unique and therefore will not treat Hourigan any differently than the rest of the plaintiffs.

Plaintiffs' argument at its core is that CIGNA P & C's representations to them about lifetime commitment and the like were false. To support this argument, plaintiffs point to various internal documents which allegedly evidence CIGNA P & C's secret—and long-term—intent to abandon the COMPAR program. For example, plaintiffs refer to a document, dated September 26, 1986, entitled "COMPAR STRATEGY," which states: "Based on the CIGNA Strategy ... abandoning COMPAR was, in fact, an option." Atkin Cert.Ex. 47.[13] However, defendants refute this argument by pointing out that plaintiffs' Exhibit 47 (attached to the Atkin Cert.) reflects only part of the original document; in short, in the conclusion section of the entire document (which is not attached to plaintiffs' Exhibit 47 but is attached to defendants' Exhibit 70), it states: "The program has matured significantly in the last five years. The next half decade should be an extension of our past good progress, with even better results, due to joint support and implementation of our strategies." Martin Cert.Ex. 70.

In sum, defendants argue that the undisputed testimony in the record shows that CIGNA P & C did not consider ending COMPAR until late 1989/early 1990, and that once the decision was made, plaintiffs were promptly advised. Martin Cert.Ex. 46 at 208–09. Defendants concede that there are documents showing that CIGNA P & C began reviewing the viability and profitability of the COMPAR program as early as 1987 but add that there is no evidence that any serious consideration was given to ending COMPAR at that time. Martin Cert.Ex. 46 at 123–25, 208–09 and Ex. 45 at 74–76. In addition, defendants point out that each of the plaintiffs has testified that he has no evidence that any of the declarants—said to

have made the misrepresentations set forth in the Amended Complaint—believed, at the time they spoke, that their "representations" were untrue, or that those statements were uttered with an intent to deceive. *See* Martin Cert.Ex. 1 at ¶ 29 & Exs. 32–36.

### DISCUSSION

Fed.R.Civ.P. 56(c) provides for summary judgment when the moving party demonstrates that there is no genuine issue of material fact and the evidence establishes the moving party's entitlement to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Orson, Inc. v. Miramax Film Corp.*, 79 F.3d 1358, 1366 (3d Cir.1996). In making this determination, the court must draw all reasonable inferences in favor of the non-movant. *Hullett v. Towers, Perrin, Forster & Crosby, Inc.*, 38 F.3d 107, 111 (3d Cir. 1994); *National State Bank v. Federal Reserve Bank of New York*, 979 F.2d 1579, 1581 (3d Cir.1992).

Once the moving party has satisfied its initial burden, the party opposing the motion must establish that a genuine issue as to a material fact exists. *Jersey Cent. Power & Light Co. v. Lacey Township*, 772 F.2d 1103, 1109 (3d Cir.1985). However, the party opposing the motion for summary judgment cannot rest on mere allegations and must instead present actual evidence that creates a genuine issue as to a material fact for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 243, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Siegel Transfer, Inc. v. Carrier Express, Inc.*, 54 F.3d 1125, 1130–31 (3d Cir. 1995); *Quiroga v. Hasbro, Inc.*, 934 F.2d 497, 500 (3d Cir.1991) (citing *Sound Ship Building Corp. v. Bethlehem Steel Co.*, 533 F.2d 96, 99 (3d Cir.1976)); *see also Schoch v. First Fidelity Bancorporation*, 912 F.2d 654, 657

---

**13.** Plaintiffs point to specific portions of other internal memoranda allegedly evidencing CIGNA P & C's secret intent to abandon the COMPAR Program before plaintiffs were informed of such in 1990. The portions cited to the Court are not particularly persuasive. In most, if not all of the instances, an analysis of the entire document undermines plaintiffs' assertions. For example, plaintiffs point to an internal document, dated July 14, 1987, in which COMPAR's president, Spike McKeeta, states: "I think it is important to inform you of some serious concerns of members of my staff about the perceived 'chipping away' of the importance, necessity, and commitment of the corporation to COMPAR." Atkin Cert .Ex. 48. However, McKeeta concludes in that same document that: "I am totally committed to COMPAR. As President of COMPAR I feel my most important responsibility is to see that this segment survives both in the short and long term." *Id.*

(3d Cir.1990) ("unsupported allegations in [a plaintiff's] memorandum and pleadings are insufficient to repel summary judgment"); Fed.R.Civ.P. 56(e) (requiring non-moving party to "set forth specific facts showing that there is a genuine issue for trial.") "In other words, the inquiry involves determining, whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Pitak v. Bell Atlantic Network Svcs., Inc.,* 928 F.Supp. 1354, 1366 (D.N.J.1996) (citations omitted).

### 1. *Fraud*

The Amended Complaint asserts two fraud claims against the defendants—one for fraudulent inducement and one for fraudulent concealment.

 The elements of a claim for common law fraud in New Jersey are: (1) a material misrepresentation of a presently existing or past fact; (2) knowledge or belief by the defendant of its falsity; (3) an intention that the other person rely on it; (4) reasonable reliance thereon; and (5) resulting damages.[14] *Gennari v. Weichert Co. Realtors,* 288 N.J.Super. 504, 535, 672 A.2d 1190 (App. Div.1996); *see also McDonald's Corp. v. Miller,* 1994 WL 507822, at *9 (D.N.J.1994), *aff'd,* 60 F.3d 815 (3d Cir.1995); *Raul Intern. Corp. v. Sealed Power Corp.,* 586 F.Supp. 349, 357 (D.N.J.1984) (citations omitted). In addition, allegations of fraud must be proved by clear and convincing evidence. *Vanguard Telecommunications, Inc. v. Southern New England Tel. Co.,* 722 F.Supp. 1166, 1187 (D.N.J.1989), *aff'd,* 900 F.2d 645 (3d Cir. 1990); *Fox v. Mercedes–Benz Credit Corp.,* 281 N.J.Super. 476, 484, 658 A.2d 732 (App. Div.1995). Thus, to defeat a defendant's motion for summary judgment, a plaintiff must meet his or her "burden of coming forward with evidence which could lead a jury to find clear and convincing proof of fraud...." *Moffatt Enterprises, Inc. v. Borden Inc.,* 807

F.2d 1169, 1174–75 (3d Cir.1986) (citations omitted).

 Statements as to future or contingent events, to expectations or probabilities, or as to what will or will not be done in the future, do not constitute misrepresentations, even though they may turn out to be wrong. *Chatlos Systems, Inc. v. National Cash Register Corp.,* 479 F.Supp. 738, 749–49 (D.N.J. 1979); *aff'd in part, rev'd in part,* 635 F.2d 1081 (3d Cir.1980). Similarly, statements that can be categorized as "puffery" or "vague and ill-defined opinions" are not assurances of fact and thus do not constitute misrepresentations. *Diaz v. Johnson Matthey, Inc.,* 869 F.Supp. 1155, 1165 (D.N.J. 1994); *see also VT Investors v. R & D Funding Corp.,* 733 F.Supp. 823, 838 (D.N.J.1990) (statements that company in which plaintiffs invested would soon generate positive cash flow in excess of $60,000 per month characterized by court as non-actionable "puffery" because it was an emphatic statement of opinion); *see also Schott Motorcycle Supply, Inc. v. American Honda Motor Co., Inc.,* 976 F.2d 58, 63–64 (1st Cir.1992) (court held that representations concerning a commitment to the motorcycle market and the future profitability of plaintiff's franchise were merely opinions of future events and could not be justifiably relied upon as "facts"); *Vaughn v. General Foods Corp.,* 797 F.2d 1403, 1411 (7th Cir.1986) (court rejected a franchisee's efforts to sustain a claim for fraudulent nondisclosure against its franchisor, based on the latter keeping confidential its intention to divest its unprofitable Burger Chef operations, while representing that it intended to build operation into a fast food contender). Indeed, in order to constitute a fact, a statement's content must be susceptible of "exact knowledge" at the time it is made. *Id.; see also Notch View Assoc., A.D.S. v. Smith,* 260 N.J.Super. 190, 202–03, 615 A.2d 676 (Law Div.1992) (statement as to future event has been held to constitute actionable misrepresentation when "the defendant [has] ... no intention at the time he makes the statement of fulfilling the promise.")

---

**14.** To prove fraudulent concealment, the plaintiff must show that the defendant was silent in the face of an obligation to disclose certain facts, instead of an affirmative misrepresentation. *Bal-*

*dasarre v. Butler,* 254 N.J.Super. 502, 521, 604 A.2d 112 (App.Div.1992), *aff'd in part, rev'd in part,* 132 N.J. 278, 625 A.2d 458 (1993).

In this case, the purported fraudulent statements that plaintiffs attribute to CIGNA P & C in the Amended Complaint are replete with predictions of future events—such as "relationship would be long lasting," "agreement one in 'perpetuity'," "COMPAR part of CIGNA's future plans," "COMPAR would take CIGNA into the twenty-first century and beyond"; *see also* Martin Cert. Exs. 21 & 24 (stating, for example, that CIGNA P & C and its personnel were committed to the future success of the COMPAR program, that COMPAR was the "program for the 1990's and beyond," and that the COMPAR program was like a "marriage.") In short, virtually all of the statements plaintiffs recount use words such as "will," "plan" or "expect" to indicate their future orientation. However, predictions of the future, which were believed when made, cannot serve as a basis for a fraud claim just because they subsequently turn out not to be true.[15]

In addition, "[a] contractual provision flatly contradictory to prior oral assurances should cause most people—and particularly experienced, knowledgeable business people—to pause." *Elias Bros. Restaurants, Inc. v. Acorn Enterprises, Inc.*, 831 F.Supp. 920, 924 (D.Mass.1993) (fraud claim rejected where precise terms of contract prevented reasonable reliance on prior oral statements); *see also Pierce v. Atchison, Topeka and Santa Fe Railway Co.*, 65 F.3d 562, 569–70 (7th Cir.1995) (party's reliance on oral statements inconsistent with written contract unreasonable as matter of law). Indeed, in this case, each Full Service Agency Agreement contained a merger or integration clause which explicitly nullified all prior oral and written agreements between the agency and CIGNA P & C. Supp.App. Ex. 2. The applicable provision of the 1990 Agreement reads as follows:

11. This Agreement is a Full Service Agency Agreement between you and us. Any previous agency agreement, either between you and us, whether oral or written, is now void. The Agreement may be amended only in writing and the amendment must be signed by you and us.

Thus, given that the express language of the contracts, signed by the plaintiffs, explicitly nullifying any previous agreements, oral or written, it is manifestly unreasonable for plaintiffs to assert that they reasonably relied on any alleged statements concerning the lifetime or perpetual duration of COMPAR.

Finally, "[t]he parol evidence rule operates to prohibit the introduction of oral promises to alter or vary an integrated written agreement." *Filmlife, Inc. v. Mal "Z" Ena, Inc.*, 251 N.J.Super. 570, 575, 598 A.2d 1234 (App.Div.1991). Indeed, "[t]he rule that

---

15. Plaintiffs' allegations that CIGNA P & C acted fraudulently in telling them that they had a lifetime commitment from CIGNA because, at the time, CIGNA P & C was secretly planning to terminate the COMPAR program are also without merit. To support their argument, plaintiffs point to various internal documents, including, for example, a document, dated September 26, 1986, entitled "COMPAR STRATEGY," which states: "Based on the CIGNA Strategy ... abandoning COMPAR was, in fact, an option." Atkin Cert. Ex. 47. However, defendants point out that this document—plaintiffs' Exhibit 47 (attached to the Atkin Cert.)—reflects only part of the original document; in short, in the conclusion section of this document (which is not attached to plaintiffs' Exhibit 47 but is in defendants' Exhibit 70), it states: "The program has matured significantly in the last five years. The next half decade should be an extension of our past good progress, with even better results, due to joint support and implementation of our strategies." Martin Cert. Ex. 70. The other internal documents that plaintiffs allude to are of the same ilk. This deficiency cannot be overcome on this record. For example, plaintiffs point to an internal document, dated July 14, 1987, in which COMPAR's president, Spike McKeeta, states: "I think it is important to inform you of some serious concerns of members of my staff about the perceived 'chipping away' of the importance, necessity, and commitment of the corporation to COMPAR." Atkin Cert. Ex. 48. However, McKeeta concludes in that same document that: "I am totally committed to COMPAR. As President of COMPAR I feel my most important responsibility is to see that this segment survives both in the short and long term." *Id.* The crux of the statements and quotes that plaintiffs attribute to various executives reveal the frank discussion that occurs consistently in business. These quotes reflect CIGNA P & C's continuing evaluation of the COMPAR program and do not evidence an intent to mislead or to misrepresent. *See, e.g.,* Plaintiff 12G at 13–15. In sum, plaintiffs have failed to present the Court with any documents that amount to clear and convincing evidence of CIGNA P & C's secret intent to abandon the COMPAR program before 1990.

a specific undertaking in a written agreement is not to be varied or contradicted by parol [evidence] is a rule of substantive law and not of evidence merely." *Id.* at 575, 598 A.2d 1234 (citations omitted). Although introduction of extrinsic evidence to prove fraud in the inducement is a well-recognized exception to the parol evidence rule, *id.*, a party may not seek to contradict the express terms of a writing to avoid obligations he knowingly assumes. *Winoka Village v. Tate*, 16 N.J.Super. 330, 333–34, 84 A.2d 626 (App.Div.1951) ("Men are usually bound by the import of documents signed by them and which they had the ability and opportunity to read. Notable exceptions are when the signature is obtained by fraud or imposition in the execution of the contract, as by a willful misrepresentation to its purport or contents.") (citations omitted).

In this case, plaintiffs have failed to adduce evidence showing their assent to and signature of the COMPAR agreements was obtained by fraud, or that they were induced to enter into the agreements through "willful misrepresentations" as to the "purport or contents" of the contracts.[16] For example, no plaintiff has testified that he was told that the notice termination provision was inoperable or that despite the merger clause, part of the agreement could be oral. Moreover, the internal documents referred to by the plaintiffs in their briefs and during oral argument,

do not evidence any long-term secret intent on the part of the defendants to abandon the COMPAR program before 1990. Accordingly, summary judgment is granted to the defendants as to plaintiffs' fraud claims.[17]

### 2. *Breach of Fiduciary Duty*

■ Under New Jersey law, a confidential or fiduciary relationship encompasses all relationships "whether legal, natural or conventional in their origin, in which confidence is naturally inspired, or in fact, reasonably exists." *Pascale v. Pascale*, 113 N.J. 20, 33–34, 549 A.2d 782 (1988) (citation omitted). The essentials of a confidential relationship "are a reposed confidence and the dominant and controlling position" asserted by one side or party such that circumstances make it certain that the parties do not deal on equal terms. *In re Stroming's Will*, 12 N.J.Super. 217, 224, 79 A.2d 492 (App.Div.1951). In short, such a relationship "does not exist where the parties deal on terms of equality[.]" *Id.*

A fiduciary is a person with a duty to act primarily for the benefit of another.

\*　　\*　　\*　　\*　　\*　　\*

■ A fiduciary relationship implies a condition of superiority of one of the parties over the other. Generally, in a fiduciary relationship, the property, interest or

16. Plaintiffs argue that *Jacobs Manufacturing Company v. Sam Brown Co.*, 19 F.3d 1259 (8th Cir.1994), and *McEvoy Travel Bureau, Inc. v. Norton Company*, 408 Mass. 704, 563 N.E.2d 188 (Mass.1990), support their argument that the evidence in the record in this case demonstrates, at the very least, that a genuine issue as to a material fact exists as to the material misrepresentation claim. However, these cases are inapposite. In addition to being a Massachusetts state court case, albeit the highest court, and an opinion rendered on a judgment notwithstanding the verdict rather than on a summary judgment motion, in *McEvoy* there are specific memoranda proving that the defendant company ("Norton") fraudulently induced plaintiff into signing a contract. In sum, Norton repeatedly assured McEvoy that the parties would have a long term arrangement even though shortly before McEvoy signed the contract Norton circulated internal memoranda within the company "indicating that the arrangement with McEvoy was a 'trial arrangement ... for 1981,' and further indicating that Norton should keep all its options open, including a so-

called 'in-house' option that could dispense with the need for McEvoy," 408 Mass. at 708, 563 N.E.2d 188. *Jacobs* also does not aid the plaintiffs. In *Jacobs*, the manufacturer made direct, individual representations to the distributor after it specifically inquired about the terms of its contract and the future of its distributor agreement that were contrary to knowledge then within manufacturer's possession. 19 F.3d at 1261–62. Specifically, the manufacturer had hired a consultant to develop alternative distribution plans and admitted at trial that based on the consultant's report it was considering changing its basic method of distribution; however, the manufacturer never disclosed this information to the distributor. *Id.*

17. For the same reasons set forth above regarding plaintiffs' fraudulent inducement claim, plaintiffs also have failed to prove fraudulent concealment—i.e., that defendants were "silent in the face of an obligation to disclose" certain facts. *See Baldasarre*, 254 N.J.Super. at 521, 604 A.2d 112.

authority of the other is placed in the charge of the fiduciary ... [I]t extends to every possible case in which a fiduciary relation exists in fact, and in which there is confidence reposed on one side and resulting domination and influence on the other ... There is no invariable rule which determines the existence of a fiduciary relationship, the one in the other, but there must exist a certain inequality, dependence, weakness of age, of mental strength, business intelligence, knowledge of the facts involved, or other conditions, giving to one advantage over the other. *Ritchie Enterprises v. Honeywell Bull, Inc.*, 730 F.Supp. 1041, 1053 (D.Kan.1990). Moreover, fiduciary duties are not imposed in ordinary commercial business transactions. *International Minerals and Min. v. Citicorp, North America*, 736 F.Supp. 587, 597 (D.N.J. 1990) ("[w]here a party does not owe another a duty of care absent the existence of a contract, a separate duty of care cannot arise simply by virtue of the existence of the contract."); *see also Glenside West Corp. v. Exxon Co., U.S.A.*, 761 F.Supp. 1100, 1116 (D.N.J.1991) ("no fiduciary relationship exists between franchisors and franchisees under New Jersey law."); *Coca-Cola Bottling Co. of Elizabethtown v. Coca-Cola Co.*, 696 F.Supp. 57, 73 (D.Del.1988) (a company and their bottlers, "although bound together by their common interest in promoting the sale of Coca-Cola, are arms-length bargaining parties, not partners."), *aff'd*, 988 F.2d 386 (3d Cir.1993). In sum, as the district court in *Coca-Cola* stated, "[t]he dominant theme of the case law ... is that fiduciary relationships arise where one party has the power and opportunity to take advantage of the other, because of that other's susceptibility or vulnerability." *Id.* at 75. Moreover, characterizing the relationship between the parties as a "special partnership" is insufficient to create a legal partnership, giving rise to fiduciary obligations. *Id.* at 74.

In this case, the relationship between the parties is similar to that between a company and its distributor—"although bound together by their common interest in promoting the sale [of insurance] ... are

arms-length bargaining parties, not partners." *Coca-Cola Bottling Co.*, 696 F.Supp. at 73. Plaintiffs disagree with this analysis, arguing that the COMPAR program created fiduciary duties on behalf of CIGNA P & C because the relationship was "a special one" based on "trust and confidence." Amended Complaint ¶ 20, Martin Cert. Ex. 1. Plaintiffs add that they were "repeatedly told by CIGNA that the COMPAR relationship was like a marriage and that plaintiffs were part of the family, and even sent plaintiffs a CIGNA COMPAR videotape showing the placing of a wedding band on a finger to depict the nature of the relationship between CIGNA and its COMPAR agents." *Id.*

To support their breach of fiduciary duty argument, plaintiffs primarily rely on *Tiberi v. CIGNA Corporation*, 89 F.3d 1423 (10th Cir.1996), a Tenth Circuit case in which the Court of Appeals held that Tiberi, a former COMPAR agent, could assert a claim for breach of fiduciary duty. Speaking specifically about the fiduciary duty claim, the court held that "Tiberi has presented sufficient evidence to prove that there exist genuine issues of material fact regarding whether such a [fiduciary] relationship existed." *Id.* at 1432. However, unlike this case, in *Tiberi* the Court concluded from the evidence before it that "Tiberi's success hinged solely on CIGNA's performance" and that "CIGNA made the majority of the important business decisions for Tiberi and the other COMPAR agents." *Id.* By contrast, in this case, plaintiffs fail to present any evidence that the relationship between any plaintiff and CIGNA P & C was anything more than that of an ordinary contractual relationship. Moreover, plaintiffs fail to present any documents or testimony evidencing domination and control by CIGNA P & C. The fact is that the signed contract executed by each of the plaintiff agencies describes each agent as an independent contractor and states: "You are free to exercise your own judgment in conducting your business." Supp.App. Ex. 2 at ¶ 1(b). Indeed, plaintiffs' own testimony confirms that they operated fully independent businesses and made their own business decisions. Martin Cert. Exs. 16–19.[18] According-

---

18. For example, Hourigan testified in his deposi- tion that he made all his own business decisions,

ingly, summary judgment is granted to the defendants as to plaintiffs' breach of fiduciary duty claim.

### 3. *Promissory Estoppel*

The elements of promissory estoppel in New Jersey are: (1) a clear and definite promise by the promisor; (2) the promise must be made with the expectation that it will induce reliance by the promisee; (3) the promisee must reasonably rely upon the promise; and (4) the promisee must experience substantial reliance on the promise. *Pitak*, 928 F.Supp. at 1367 (citing *R.J. Longo Constr. Co. v. Transit America, Inc.*, 921 F.Supp. 1295, 1305 (D.N.J.1996); *Royal Assocs. v. Concannon*, 200 N.J.Super. 84, 91–92, 490 A.2d 357 (App.Div.1985); *Fairken Assocs. v. Hutchin*, 223 N.J.Super. 274, 279–80, 538 A.2d 465 (Law Div.1987)). However, a "truthful statement as to the present intention of a party with regard to future acts is not the foundation upon which an estoppel may be built. The intention is subject to change." *In Re Phillips Petroleum Securities Litigation*, 881 F.2d 1236, 1250 (3d Cir. 1989) (quoting *Metropolitan Life Ins. Co. v. Childs Co.*, 230 N.Y. 285, 130 N.E. 295 (1921)).

In this case, the facts do not establish a "clear and definite" promise by the defendants to the plaintiffs. Rather, what plaintiffs point to as promises are, in reality, only statements of opinions or expectations which do not support an estoppel claim. Accordingly, summary judgment is granted to the defendants as to plaintiffs' promissory estoppel claim.

### 4. *Equitable Estoppel*

To prevail on an equitable estoppel claim, a plaintiff must demonstrate: (1) a material misrepresentation; (2) reasonable reliance upon the misrepresentation; and (3) damages resulting from the misrepresenta-

tion. *Hein v. F.D.I.C.*, 88 F.3d 210, 221 (3d Cir.1996), *cert. denied*, —— U.S. ——, 117 S.Ct. 683, 136 L.Ed.2d 608 (1997); *Hakimoglu v. Trump Taj Mahal Assoc.*, 876 F.Supp. 625, 638 (D.N.J.1994), *aff'd*, 70 F.3d 291 (3d Cir.1995). In addition, substantial reliance on the alleged misrepresentations is not enough; rather, in order to justify the court's application of equitable estoppel, the reliance must be "justified and reasonable." *Id.* (citations omitted); *see also Hein*, 88 F.3d at 221 ("[a] party's reliance on a misrepresentation must have been reasonable in that the party claiming the estoppel did not know nor should it have known that its adversary's conduct was misleading.") Plaintiffs primarily rely on the Court's opinion in *Tiberi*, stating:

> Tiberi claims that he chose to stay in COMPAR based on CIGNA's assurances and suffered substantial loss after making that choice; this is all that the equitable estoppel doctrine requires ... CIGNA [also] maintains that it made no representations to Tiberi upon which he could reasonably rely for the purposes of equitable estoppel. CIGNA claims that the statements that its promises to correct COMPAR's problems were so vague, and left unfulfilled for such a long period of time, that Tiberi could not have relied on them. In essence, CIGNA argues that the court should not allow equitable estoppel to attach because it was not serious about the promises it made to Tiberi. This would allow CIGNA "to profit from its own fraud." Such a result is inherently inequitable.

89 F.3d at 1429–30 (citations omitted).

However, *Tiberi* is distinguishable from this case in that the Tenth Circuit was not deciding the equitable estoppel claim on the merits but was merely deciding whether or nor the district court erred in refusing to toll the applicable statute of limitations.[19] 89 F.3d at 1428–29. Moreover, plaintiffs cannot make out a prima facie case of equitable

---

decided what was and was not good for his agency, hired and fired people without consulting CIGNA and could enter into lease agreements or purchase property in the name of his corporation. Martin Ex. 16 at 214–15. In addition, Alexander testified that when he signed the COMPAR agreement he did not think he was becoming an employee of the Insurance Company of North America (one of the defendants in

this case) and that he understood that he would still have discretion in the operation of his businesses even though he signed the agreement. Martin Ex. 19 at 95–96.

19. The Court in *Tiberi* decided that the district court had erred in not tolling the limitation statute and then added that "Tiberi has presented facts which indicate that equitable estoppel *may*

estoppel because, as stated by the Court in its discussion on the fraud claims, plaintiffs have failed to demonstrate any material misrepresentations of presently existing facts on the part of the defendants.[20] Accordingly, summary judgment is granted to the defendants as to plaintiffs' equitable estoppel claim.

### 5. *Negligent Misrepresentation*

■ Under New Jersey law, to prevail on a negligent misrepresentation claim, a plaintiff must prove that the defendant negligently made an incorrect statement, upon which the plaintiff justifiably relied. *H. Rosenblum, Inc. v. Adler*, 93 N.J. 324, 334, 461 A.2d 138 (1983).[21] Plaintiffs have failed to provide this Court with evidence of either (1) negligence on the part of the defendants in making statements or (2) justifiable reliance by the plaintiffs on defendants' statements. Instead, defendants' statements appear to be nothing more than predictions of the future and mere opinion, rather than statements of

---

*attach* in this case." 89 F.3d at 1429 (emphasis added).

20. The following facts in *Tiberi* make it distinguishable from this case:

In 1983 and 1984, CIGNA suffered substantial losses ... At the 1986 COMPAR convention, David Prentiss, president of CIGNA's Agency division ... offered incentives to "profitable" COMPAR members who remained in the program ... Tiberi decided to keep [his] ... Agencies under the program ... Tiberi incurred significant losses as a result of this decision. Consequently, Tiberi's agencies submitted a letter to CIGNA, dated March 3, 1986, expressing their dissatisfaction with the program ... In June of that year, at the COMPAR National Advisory Council meeting, the Council resolved to make "changes ... to improve [the members'] position in the marketplace," and to "work hard to improve our commitment to COMPAR." ... After 1986, however, it became apparent to CIGNA that it could not sustain COMPAR. In an internal document dated April 15, 1987, CIGNA stated that its worsening relationship with its smaller COMPAR agents required "fundamental changes in the COMPAR program and its strategic direction." ... The document lists the abandonment of COMPAR as a viable option ... CIGNA, however, chose to restrict further its coverage and raise its prices, despite warnings from McKeeta that such actions would cause "serious ramifications." ... CIGNA never notified Tiberi of these developments ... [Moreover, t]hroughout 1988 and 1989, CIGNA attempted to allay the concerns of its agents with statements such as the following: Through the COMPAR program we can give you what you need....

89 F.3d at 1426. Thus, unlike in this case, in *Tiberi*, the plaintiff advised CIGNA in 1986 of his dissatisfaction with the COMPAR program. Moreover, in *Tiberi* there was a specific internal document from 1987 which clearly indicated the need for "fundamental changes" to the COMPAR program. Finally, there was definitive evidence of detrimental reliance in *Tiberi*—i.e., the evidence showed that Tiberi lost money from the program starting in 1983 and through 1989, well after he informed CIGNA of his dissatisfaction

with COMPAR. By contrast, in this case, plaintiffs never informed defendants of their dissatisfaction with COMPAR and there was no specific internal document evidencing defendants' intent to abandon the program. Moreover, in this case plaintiffs fail to demonstrate detrimental reliance—i.e., plaintiffs argue that they suffered substantial damages but they do not demonstrate either that any of these damages resulted from defendants' misrepresentations or that their respective agencies were unprofitable before they signed the transition agreement. Def. Brief at 33; Martin Ex. 60.

21. The parties effectively concede that their respective independent research failed to locate a single New Jersey case in which a cause of action for negligent misrepresentation was successfully asserted between commercial entities who were parties to an arms-length contractual arrangements. In short, plaintiffs' reliance on *J. Fitzpatrick and Company v. Solna*, 1991 WL 186661 (D.N.J. Sept.5, 1991), is misguided given that this Court cannot give binding effect to an unpublished opinion. Further, this Court refuses to adopt the reasoning set forth in *Fitzpatrick*. In that case, Solna (the defendant company) announced in 1987 "that it would soon release a new and improved 19 × 25–inch press to dealers for sale to their customers. Based on these misrepresentations, plaintiffs assert that it began marketing the new press to customers and, as a result, became unable to market an older 18 × 25–inch press effectively." *Id.* at *1. In addition, defendants were induced into signing a Minimum Purchase Agreement requiring them to sell eight units of the old 18 × 25–inch press during 1988; plaintiffs did not want to sign this Agreement but were allegedly told that "the Minimum Purchase Agreement would be of no consequence and, further that Solna would not terminate Fitzpatrick & Co. for failure to sell the required eight units." *Id.* In the end, Solna never released the new 19 × 25–inch press; as a result, Solna terminated its dealer agreement with Fitzpatrick & Co. "because it had not met the sales requirements of the Minimum Purchase Agreements." *Id.* at *2. This case is clearly distinguishable on its facts and does not satisfy the requirements for a negligent misrepresentation claim.

fact.[22] Moreover, plaintiffs have not put forth any evidence of any negligent statements generally. Accordingly, summary judgment is granted to the defendants as to plaintiffs' negligent misrepresentation claim.

### 6. *Breach of Contract*

*Borbely v. Nationwide Mutual Insurance Co.,* 547 F.Supp. 959, 964 (D.N.J.1981), presents a factual scenario that is instructive to the Court's analysis here. In that case, the plaintiff-agents executed exclusive agency agreements with Nationwide which were periodically revised by the parties. The agreements had termination clauses. *Id.* at 967. In 1975, Nationwide began an internal study which, after three years, culminated in a decision to withdraw from the New Jersey insurance market. *Id.* at 964. "None of the agents were informed of the results of these studies" until its announcement of such on or about October 13, 1977. *Id.*

At trial, each plaintiff testified concerning representations made to him by Nationwide employees, usually the local District Sales Managers ("DSM's"), and officials, at the time he was recruited as an agent and during the course of his agency relationship with defendant. In general, the representations involved assurances of lifetime security and the opportunity to build one's own business and eventually to pass it on to a family member, financial security, and the companies' desire to retain agents until retirement. With respect to termination, Nationwide employees essentially assured plaintiffs that the companies did not invoke the cancellation provision unless an agent performed or produced poorly despite assistance, failed to fulfill obligations to Nationwide or its policyholders, or was dishonest.

*Id.* at 967–68.

In construing the affect of the DSMs' representations on the agreements signed by the plaintiff-agents in *Nationwide,* Judge Thompson held that:

it is manifest that this language cannot be construed to entitle plaintiffs to lifetime agencies despite verbal assurances to that effect antecedent to the execution of the operative agreement. Agreements for lifetime employment are enforced with marked reluctance by the courts, and then only when the commitment has "been clearly, specifically and definitely expressed." At best, the representations by Nationwide employees with respect to lifetime tenure amount to "friendly assurances(s)"; they are patently insufficient under the law to create an obligation to defendant to retain plaintiffs until death or retirement.

*Id.* at 969–70; *Weichert Co. Realtors v. Ryan,* 128 N.J. 427, 435, 608 A.2d 280 (1992) (contract unenforceable if terms too indefinite to allow court to ascertain what the parties promised to do). *See also* N.J.Stat. Ann. § 17:22A–15 (West 1994) (in a written contract between an insurer and an agent, New Jersey requires that it "contain the duties, responsibilities and limitations of authority between the agent and the appointing company."); N.J.Stat.Ann. § 25:1–5 (West 1995) (oral contracts violate the statute of frauds if they cannot be performed within a year).

Judge Thompson also added in a footnote to *Nationwide* that "[g]iven the inclusion in each successive Agents[sic] Agreement of a clause barring amendments and modifications unless embodied in a writing signed by the agent and an officer of the companies, a person of ordinary prudence could not reasonably presume the DSMs had authority to alter verbally the terms of the agreement." *Id.* at 970 n. 17. In sum, Judge Thompson held "that the Agent's Agreement was intended by the parties to be the full expression of their bargain." *Id.* at 971.[23]

---

**22.** Plaintiffs' references to other internal memoranda allegedly evidencing CIGNA P & C's secret intent to abandon the COMPAR Program before plaintiffs were informed of such in 1990 also do not amount to negligent misrepresentation on the part of the defendants: for example, the statement "I think it is important to inform you of some serious concerns of members of my staff about the perceived 'chipping away' of ... COM-

PAR." (Atkin Cert. Ex. 48) and "It [COMPAR] was on shaky ground, and the shaky ground was really a function of expense issues." (*Id.* at Ex. 29).

**23.** Judge Thompson also stated that "[h]aving found that the agreement is integrated and that in unambiguous terms it provides for cancellation at will by either party, I must also conclude

There is great similarity between the facts in *Nationwide* and those in this case. Just as plaintiffs did in *Nationwide*, the plaintiffs in this case claim they relied on a number of employees' statements and other representations which led them to believe they had perpetual or lifetime contracts with the defendants. However, these alleged statements are not "clearly, specifically and definitely expressed" and therefore appear to amount to nothing more than "friendly assurances" by the defendants. In short, these statements are insufficient under the law to create a binding obligation by the defendants to the plaintiffs until death or retirement. *See Nationwide*, 547 F.Supp. at 969–70.

For the same reason, the 1990 COMPAR Agreement (and its predecessors and successors) in this case must be viewed as constituting the entire agreement between CIGNA P & C and its COMPAR agents. Further, just as in *Nationwide*, the parol evidence rule negates any attempts by the plaintiffs in this case to modify or change the terms of their Full Service Agency Agreements by resort to prior or contemporaneous agreements or understandings.

Plaintiffs have not presented this Court with any genuine issues as to a material fact regarding their breach of contract claim against the defendants. Accordingly, as a matter of law, summary judgment is granted to the defendants as to plaintiffs' breach of contract claim.

### 7. *Reformation.*

Reformation is permissible in cases where there has been (1) a unilateral mistake accompanied by fraud or (2) a mutual mistake with regard to the terms of the instrument. *Brodzinsky v. Pulek*, 75 N.J.Super. 40, 48, 182 A.2d 149 (App.Div.1962). Absent fraud, accident or mistake, courts will not grant the high remedy of reformation. *Dunkin' Donuts of America, Inc. v. Middletown Donut Corp.*, 100 N.J. 166, 183, 495 A.2d 66 (1985); *Countryside Oil Co. v. Trav-*

*elers Ins. Co.*, 928 F.Supp. 474, 485 (D.N.J. 1995) (high order of proof such as "clear, cogent and convincing" is required to support reformation). Reformation based on a unilateral mistake accompanied by fraud requires a plaintiff to show by clear and convincing evidence that (1) the mistake was so great that to enforce the contract would be unconscionable; (2) the mistake must relate to a material feature of the contract; (3) the plaintiffs exercised reasonable care; and (4) the relief afforded must not seriously prejudice the opposing party. *Fleming Companies, Inc. v. Thriftway Medford Lakes, Inc.*, 913 F.Supp. 837, 843 (D.N.J.1995) (citations omitted).

Here, defendants claim that there is no issue of mutual mistake and therefore plaintiffs' reformation claim, if any, must be based on a unilateral mistake accompanied by fraud. Plaintiffs do not refute this point. Indeed, plaintiffs do not even address the reformation claim in their opposition brief to this motion. Accordingly, plaintiffs have failed to present any evidence, much less clear and convincing evidence, that there is anything unconscionable in enforcing the COMPAR contracts, as written, or that the plaintiffs reasonably relied upon statements which were contrary to the express language of the contracts. Accordingly, summary judgment is granted to the defendants as to plaintiffs' reformation claim.

### 8. *Punitive Damages*

Plaintiffs seek punitive damages on the first, second, third and fourth causes of action in their Amended Complaint—i.e., for breach of fiduciary duty, negligent misrepresentation and fraud. Amended Complaint ¶ 60(b), Martin Cert. Ex. 1. Plaintiffs correctly state that punitive damages are appropriate in both fraud and breach of fiduciary duty claims. *W.A. Wright, Inc. v. KDI Sylvan Pools, Inc.*, 746 F.2d 215, 217 (3d Cir. 1984); *Rendine v. Pantzer*, 141 N.J. 292, 314,

---

that the evidence offered by plaintiffs as to representations of lifetime security and termination only for cause is barred by the parol evidence rule. 'The parol evidence rule applies ... to prevent the substantive alteration of contractual terms agreed upon by the parties and expressed

in an integration of their bargain, by resort to other prior or contemporaneous agreements or understandings.' " *Nationwide*, 547 F.Supp. at 971 (citing *Garden State Plaza Corp. v. S.S. Kresge Co.*, 78 N.J.Super. at 496, 189 A.2d 448).

661 A.2d 1202 (1995); *Diaz,* 869 F.Supp. at 1168; *Perth Amboy Iron Works, Inc. v. American Home Assurance Co.,* 226 N.J.Super. 200, 227, 543 A.2d 1020 (App.Div.1988); *Sandler v. Lawn–A–Mat Chem. & Equip. Corp.,* 141 N.J.Super. 437, 449, 358 A.2d 805 (App.Div.1976). However, given that the Court has already decided to grant summary judgment to the defendants on plaintiffs' fraud, fiduciary duty and negligent misrepresentation claims, whether or not punitive damages are appropriate is Moot.[24]

### 9. *Personal Jurisdiction over CIGNA Corp.*

Fed.R.Civ.P. 4(e) authorizes a district court to assert personal jurisdiction over a nonresident to the extent permissible under the law of the state where the district court is located. *See Mesalic v. Fiberfloat Corp.,* 897 F.2d 696, 698 (3d Cir.1990); *Database America v. Bellsouth Advertising & Pub.,* 825 F.Supp. 1195, 1207 (D.N.J.1993). New Jersey's long arm statute grants jurisdiction to the full extent allowed by the United States Constitution. *See* N.J. Civil Practice Rule 4:4–4(b)(1)(C)(3); *Associated Business Tel. Systems v. Danihels,* 829 F.Supp. 707, 710 (D.N.J.1993).

Moreover, in cases where the defendant has properly raised a jurisdictional defense, "the plaintiff bears the burden of demonstrating [that] contacts with the forum state [are] sufficient to give the court in personam jurisdiction." *Mesalic,* 897 F.2d at 699 (citations omitted). To meet this burden, plaintiffs can establish that either general or specific jurisdiction exists over the defendant. *Id.* General jurisdiction exists when the defendant has "continuous and systematic conduct in the forum unrelated to the subject matter of the lawsuit." *Associated Business,* 829 F.Supp. at 711. Specific jurisdiction exists when the particular cause of action at issue arose out of the defendant's contacts with the forum. *Id.*

"The minimum contacts framework, as first set out in *International Shoe Co. v. Washington,* 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945), provides the standard for determining specific jurisdiction." *Mesalic,* 897 F.2d at 699. A defendant's contacts with a forum are sufficient to establish jurisdiction if the defendant "has [purposefully] availed itself of the benefits and protection of that state," and the defendant "should reasonably anticipate being haled into court there." *Associated Business,* 829 F.Supp. at 710 (quoting *World Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 291, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980)). In short, a "defendant will not be haled into a jurisdiction solely as a result of random, fictitious, or attenuated contacts, or [based upon] the unilateral activity of another person." *Id.* (quoting *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 475, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985)).

A district court may not exercise jurisdiction over a defendant corporation if the only connection with the state is through that defendant's subsidiaries. *Jemez Agency, Inc. v. CIGNA Corp.,* 866 F.Supp. 1340, 1349 (D.N.M.1994) ("A[d]ue process mandates that the subsidiary companies cannot be the basis for asserting in personam jurisdiction over CIGNA.") Rather, "[b]efore the parent company can be haled into an out-of-state court solely by virtue of the acts of its subsidiary, due process requires that the plaintiff must make at least a prima facie showing that application of the forum state's rules of corporate law would result in piercing the corporate veil or imposing liability through any specific principles." *Id.* at 1348–49.

Under New Jersey law,[25] "parent and subsidiary corporations are distinct legal entities and courts are extremely reluctant to pierce the corporate veil between the two absent compelling circumstances." *Ricoh Co. Ltd. v. Honeywell, Inc.,* 817 F.Supp. 473, 481 (D.N.J.1993) (citations omitted). The

---

24. Moreover, plaintiffs' evidence does not show "such conscious and deliberate disregard of the interest of others that the conduct may be called wilful or wanton." *Enright v. Lubow,* 202 N.J.Super. 58, 75, 493 A.2d 1288 (App.Div.1985).

25. Whether jurisdiction exists over a nonresident parent corporation by reason of the acts of a subsidiary is a matter governed by state law. *See Jemez Agency,* 866 F.Supp. at 1342 (citing, *inter alia,* 2 James W. Moore, Moore's Federal Practice ¶ 4.41–1[6], at 4–372 (1989)).

New Jersey Supreme Court has held that a parent corporation will not be held liable for the acts of its subsidiary "unless the parent has abused the privilege of incorporation by using the subsidiary to perpetrate a fraud or injustice or otherwise to circumvent the law." *State Department of Environmental Protection v. Ventron Corp.*, 94 N.J. 473, 501, 468 A.2d 150 (1983).

However, the Supreme Court of the United States has held that a tortious act committed outside a forum, but having an effect in that forum, may, in certain circumstances, give rise to personal jurisdiction. *Calder v. Jones*, 465 U.S. 783, 789, 104 S.Ct. 1482, 79 L.Ed.2d 804 (1984)[26]; *see also Carteret Sav. Bank v. Shushan*, 954 F.2d 141, 149 (3d Cir.1992) (our initial inquiry is whether plaintiff's breach of fiduciary claim "arises from defendant's forum related activities or from non-forum related activities.") (citation omitted). In *Carteret*, the court held that plaintiff had established that the defendants had sufficient minimum contacts with New Jersey where defendant does not dispute that "throughout his representation of Carteret [plaintiff] he telephoned and corresponded with Carteret managers in New Jersey or that he traveled to Roseland, New Jersey ... to meet with Carteret management[.]" *Id.* However, in concluding that defendant's contacts amounted to sufficient minimum contacts, the court added that it was significant that "the averred purpose of the Roseland meeting constituted a culminating event in the context of Shushan's representation of Carteret: there Shushan had the opportunity to advise Carteret thoroughly concerning the closing documents and to obtain Carteret's approval for the final closing documents." *Id.*

In this case, it is undisputed by the parties that the issue is whether this Court may exercise specific (as opposed to general[27]) jurisdiction over the defendant CIGNA Corp. Thus, the issue in this case is whether specific jurisdiction exists over defendant CIGNA Corp.—i.e., whether CIGNA Corp had sufficient contacts with New Jersey, relating to the claims in this case. *Carteret*, 954 F.2d at 149–50; *Associated Business*, 829 F.Supp. at 711. Plaintiffs claim that CIGNA Corp. directly participated in the tortious conduct at issue through acts committed in, among other places, New Jersey, which caused injury in New Jersey to plaintiffs, New Jersey residents. To support their claim, plaintiffs provide the Court with the following evidence: (1) alleged fraudulent statements by Bill Taylor, CIGNA's Chief Operating Officer, and Bob Kilpatrick, Chairman and Chief Executive Officer, concerning the COMPAR "lifetime relationship"; (2) a CIGNA Corp. promotional videotape entitled "Exploring COMPAR" which was shown in New Jersey to plaintiffs, among others; and (3) allegations that Taylor made a number of fraudulent statements in a company newsletter which was disseminated in New Jersey.[28] To support their argument, plaintiffs primarily rely on *Carteret*, where the court held that jurisdiction existed when the defendant had attended a meeting in New Jersey and there were various telephone calls and letters between the parties. 954 F.2d at 149–50. However, the court in *Carteret* also pointed out that "the averred purpose of the ... meeting constituted a culminating event" in the context of defendant's representation of plaintiff and that this meeting, coupled with various telephone calls and letters between the parties established the minimum

26. *Cf. Wright v. Xerox Corp.*, 882 F.Supp. 399, 405 (D.N.J.1995) (*Calder* establishes the propositions that, where intentional tortfeasors know their actions will harm a plaintiff in a particular forum, and that the brunt of the injury caused by their actions will be felt in that forum, they will be subject to jurisdiction there.) (citing *Carteret*, 954 F.2d at 147); *see also Covenant Bank for Savings v. Cohen*, 806 F.Supp. 52, 56 (D.N.J. 1992) (declining jurisdiction where defendants' acts may have caused damages in New Jersey,

but acts were not performed with the "very purpose" of having such an impact in New Jersey).

27. Clearly, CIGNA Corp. did not have "continuous and systematic conduct" in New Jersey. *See Associated Business*, 829 F.Supp. at 711.

28. The parties do not dispute that when Taylor made these alleged fraudulent statements, he was not acting on behalf of CIGNA Corp. but rather, at the time, was the president of CIGNA Property & Casualty Insurance Company.

contacts necessary for specific jurisdiction. *Id.* at 149.

 By contrast, here the evidence of a general promotional tape and the alleged fraudulent statements made by Mr. Taylor who, at the time was not even acting on behalf of CIGNA Corp., does not amount to the requisite minimum contacts needed for this Court to exercise specific jurisdiction over defendant CIGNA Corp.[29] Accordingly, this Court does not have jurisdiction over defendant CIGNA Corp. and plaintiffs case against CIGNA Corp. is therefore dismissed in its entirety.

### CONCLUSION

For the reasons stated above, defendants' motion for summary judgment is granted as to all of plaintiffs' claims. In addition, all of plaintiffs' claims against defendant CIGNA Corp. are dismissed for lack of personal jurisdiction.

### ORDER

This matter having been opened to this Court by Putney, Twombly, Hall & Hirson and Baker & Botts, L.L.P., attorneys for defendants, CIGNA Corporation ("CIGNA Corp."), CIGNA Fire Underwriters Insurance Company, CIGNA Property and Casualty Insurance Company, CIGNA Insurance Company, Bankers Standard Insurance Company, Bankers Standard Fire & Marine Insurance Company, Century Indemnity Company, Insurance Company of North America, Pacific Employers Insurance Company, Aetna Fire Underwriters Insurance Company and Aetna Insurance Company (collectively referred to as "CIGNA P & C"), and the Court having considered the written submissions and oral argument of the parties, and good cause appearing,

IT IS on this 31st day of December, 1997,

ORDERED that defendants' motion for summary judgment, pursuant to Fed.

R.Civ.P. 56(c), for an Order of dismissal of the Amended Complaint, be and hereby is granted; and

IT IS FURTHER ORDERED that all of plaintiffs' claims against defendant CIGNA Corp. are dismissed for lack of personal jurisdiction; and

IT IS FURTHER ORDERED that a copy of this Order be served on all parties within seven (7) days of the date of this Order.

---

**29.** Plaintiffs also made sweeping allegations that Taylor, when he was COO, and Kilpatrick made a number of fraudulent representations which caused injury in New Jersey to New Jersey plaintiffs; however, these allegations do not demonstrate the sort of purposeful availment of New Jersey's benefits and protections, on the part of defendant CIGNA Corp., which would allow this Court to find that there were sufficient minimum contacts for it to exercise specific jurisdiction over CIGNA Corp. *See Associated Business,* 829 F.Supp. at 710; *World–Wide Volkswagen,* 444 U.S. at 291.